# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 14, 2011 Session

## WENDY LEVERETTE, ET AL. v. TENNESSEE FARMERS MUTUAL INSURANCE COMPANY

**Appeal from the Circuit Court for Maury County**
**No. 0913135     Jim T. Hamilton, Judge**

---

**No. M2011-00264-COA-R3-CV - Filed March 4, 2013**

---

A woman who was severely injured in a collision with an automobile driven by an unlicensed minor filed suit against the minor. The minor's parents' insurance company denied coverage and refused to defend the suit on the basis of an exclusion in the insurance policy for damages caused by a party driving without permission of the owner or a person "in lawful possession" of the vehicle. No defense was offered, and the injured party obtained a $1 million default judgment against the minor driver. The injured party and the minor's parents then jointly filed suit against the insurance company, alleging that the insurance company was liable for breach of contract, bad faith, violation of the Tennessee Consumer Protection Act, and violation of the Unfair Claims Practices Act based upon its denial of coverage. The trial court ruled that, as a matter of law, the minor was entitled to insurance coverage under her parents' policy at the time of the accident. The remainder of the case was tried, and the plaintiffs were awarded compensatory and punitive damages on the bad faith claim. The jury also found the insurance company had violated the Tennessee Consumer Protection Act, and the trial court trebled the compensatory damages and awarded attorney fees under the Act. The insurance company has raised a number of issues in this appeal, *inter alia*, the grant of partial summary judgment to the plaintiffs on the question of coverage; the finding of liability for bad faith, the liability and enhanced penalty under the TCPA, and the requirement that plaintiffs should make an election between the punitive damages and the enhanced damages. We affirm the breach of contract holding, including the conclusion that the policy terms provided coverage. We reverse and vacate the holding of liability for bad faith, including the award of punitive damages thereunder, since the statutory cause of action was not plead. We also reverse the award of treble damages under the TCPA, but affirm the finding of a violation of the Act. We affirm as modified the award of attorneys' fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Reversed in Part**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J. joined. RICHARD H. DINKINS, J., concurring in part, dissenting in part.

Michael Ross Campbell, Lauren Michelle Rutherford, Chattanooga, Tennessee; Patrick Arnold Flynn, Seth Michael Lasater, Columbia, Tennessee, for the appellant, Tennessee Farmers Mutual Insurance Company.

Richard Thomas Matthews, Columbia, Tennessee, for the appellee, Wendy Leverette, et al.

**OPINION**

## I. BACKGROUND

Tennessee Farmers Mutual Insurance Company ("TFM") denied coverage under an automobile policy for damages sustained in an accident caused by the thirteen year old daughter of its insureds, Chad and Donna Sanders ("the Sanders"). The accident was caused by the unlicensed daughter, who was driving an uninsured automobile owned by a friend's mother.

In the resulting lawsuit, the trial court granted partial summary judgment to Plaintiffs prior to trial, declaring that the insurance contract provided coverage. At the close of the evidence, the trial court granted Plaintiffs a directed verdict for breach of contract and awarded the Plaintiffs damages for that breach. Then, the jury awarded compensatory damages on the bad faith claim and found the insurance company's acts of bad faith were committed intentionally and knowingly. After a hearing, the jury awarded punitive damages against the insurance company on the same claim. The trial court then determined that the Plaintiffs were entitled to treble damages and attorney fees under the TCPA. This appeal followed.

We begin with a description of the accident, the actions of the insureds and injured parties, and the actions of the insurance company.

### A. The Accident

The accident at the core of this dispute occurred in Bedford County on December 21, 2008, when Claire Sanders, an unlicensed thirteen year old driving a car owned by Tracy Neeley, tried to navigate a sharp curve on a narrow road and crossed into the opposing lane of traffic, colliding head-on with a car driven by Wendy Leverette. Tracy Neeley's daughter Beth Neeley was in the passenger seat of her mother's car.

Claire Sanders and another girl had been visiting the Neely house. When it was time for the other girl to leave, Tracy Neely asked her daughter Beth to drive the other girl home in Tracy's car. The three girls left. Claire wanted to drive, she got into the driver's seat, and they proceeded on until the accident.

Both drivers were seriously injured. Claire Sanders suffered bruises and a broken ankle, resulting in two surgeries and medical expenses of over $14,000. Wendy Leverette's injuries were even more severe, ultimately leading to amputation of her foot.

Tracy Neeley had no automobile liability insurance at the time of the accident. However, Claire Sanders fell within the definition of "a covered person" under the terms of an automobile liability insurance policy owned by her parents and underwritten by TFM. The policy provided liability coverage of $50,000 per person for personal injury and up to $50,000 for property damage, as well as medical payments coverage in the amount of $5,000 per person.

## B. The Insurance Company Denies Coverage

Donna Sanders called TFM's Shelbyville office to report the accident two days after it occurred and was instructed to call the company's 800 number. The claims adjuster took statements from Claire Sanders and Tracy Neeley over the phone and prepared a claims form stating that Claire "did not have permission to drive vehicle."

However, the adjuster did not make any attempt to speak to Beth Neeley to better understand the circumstances that led to Claire Sanders' appearance behind the wheel of Tracy Neeley's car. Nor did he contact the State Trooper who had written up the accident report and who had issued citations to Claire Sanders and Tracy Neeley. He did not make any attempt to ascertain the extent of Wendy Leverette's injuries.

On February 4, 2009, TFM sent the Sanders a letter stating that its investigation showed that Tracy Neeley did not give Claire Sanders permission to drive the car and that she did not authorize Beth Neeley to give such permission. The letter then declared that Claire Sanders was not entitled to insurance coverage because of an exclusion in its policy that eliminated coverage for an auto not owned by the policyholders to the use, operation, or occupancy "without the permission of the owner or person or entity in lawful possession of the auto."

On February 13, 2009, counsel for Ms. Leverette and her husband Jason ("the Leverettes") sent a letter to the Sanders and to TFM's senior claims adjuster, Frank Smith, together with a then-unfiled complaint for damages against Claire Sanders. After stating that the Leverettes were reluctant to file a lawsuit against a minor child, the letter explained that

the exclusion the insurance company was relying on was inapplicable because Claire Sanders was operating the vehicle "with the knowledge and permission of the owner's daughter, who was present in the car at the time of the collision." The letter also stated that if TFM did not respond, the complaint would be filed on March 2, 2009, and it demanded that the company pay the policy limits of its liability coverage. The proof showed that all the parties understood that the demand amounted to an offer to settle for the policy limits. Mr. Smith did not reply to the letter, nor did he forward the letter to TFM's lawyers, and TFM made no attempt to settle the claim.[1]

## C. Default Judgment in Bedford County Suit Against Minor Driver

The Leverettes' complaint against Claire Sanders was filed on March 5, 2009 in the Bedford County Circuit Court. No answer was filed. The Leverettes filed a motion for default judgment and for a hearing on damages. Their counsel sent a copy of the default judgment motion to TFM, along with a letter stating that "I want to give Tennessee Farm Bureau one more opportunity to enter an appearance and defend your insured in this case."

Meanwhile, the Sanders had consulted with an attorney. He sent a letter to the Leverettes explaining that because Claire Sanders had no assets and no means to afford legal representation, and because her parents did not have adequate funds to afford legal counsel for their daughter, the attorney would not be defending the lawsuit. The attorney sent a copy of the letter and another copy of the complaint to TFM. Again, the insurance company did not respond.

The trial court conducted a hearing on the default judgment motion. The Sanders were subpoenaed, and they made a general appearance before the court, but did not offer a defense.[2] The court heard evidence about Wendy Leverette's damages, including her testimony and that of her husband, and it examined deposition testimony from Ms.

---

[1]TFM's claims file, which is part of the appellate record, also contains an exchange of correspondence between USAA (the Leverettes' insurance company) and TFM's claims adjuster Frank Smith. USAA stated that it was reimbursing its insured for damages, but that its investigation showed that TFM's insured was responsible and that it intended to recover the amount it paid. It also stated that its own investigation showed that Beth Neeley gave Claire Sanders permission to drive, and it asked TFM for an explanation of its decision to deny coverage and for a copy of the insurance policy. Mr. Smith responded that the coverage decision was TFM's alone to make, and that it would provide USAA "with a simple 'yes' or 'no' whether or not our insured violated the terms of her policy, after a complete investigation."

[2]The Sanders' appearance before the court was an essential requirement for the entry of a default judgment, for Tenn. R. Civ. P. 55.01 provides among other things that "No judgment by default shall be entered against an infant or incompetent person unless represented in the action by a general guardian, committee, conservator, or other such representative who has appeared therein."

Leverette's doctor and documentary evidence in support of the Leverettes' claim. The court then entered a judgment against Claire Sanders in the total amount of $1 million.

### D. The Leverettes and the Sanders Join Forces

On the same day that judgment was entered against Claire Sanders, her parents teamed up with the Leverettes by entering into a written agreement designed to vindicate the rights of both parties against the insurance company. The agreement provided that the two couples would cooperate with each other in any future proceedings against TFM for breach of contract or bad faith. The Leverettes agreed to pay all costs of litigation, to hold the Sanders harmless for any such costs, and not to sue the Sanders or to attempt to execute on the Bedford County judgment against Claire Sanders.

For their part, the Sanders conveyed to the Leverettes all their legal and equitable rights under their TFM insurance policy arising from the accident of December 21, 2008, and any claims arising from or connected to TFM's failure to defend or settle the claims of the Leverettes against the Sanders. The parties also agreed that any judgment they obtained in excess of the $1 million judgment against Claire Sanders and the litigation costs the Leverettes incurred would be divided equally between the Leverettes and the Sanders.

In response to issues subsequently raised by the insurance company as to the legal enforceability and efficacy of Plaintiffs agreement of August 13, 2009, the parties entered into an amended agreement on August 24, 2010, which superseded their earlier agreement. Among other things, the amended agreement specifically declared that the Sanders were granting to the Leverettes "a subrogation interest in and to all of their recoveries," as well as to all legal and equitable rights arising from the insurance contract or from the conduct of Tennessee Farmers Mutual Insurance Company. It also provided that ". . . this agreement shall not operate as a release of the liability of Sanders to Leverettes to the extent that such liability is covered by the insurance policy . . . ," but that upon the collection of any judgment obtained against TFM, the agreement would operate as "as a full and unconditional satisfaction of any judgment obtained against Sanders by Leverettes."

### II. PRE-TRIAL PROCEEDINGS IN THE MAURY COUNTY COURT

### A. The Complaint for Damages

On November 6, 2009, the Leverettes and the Sanders, individually and as parents and guardians of Claire Sanders, filed a complaint in the Maury County Circuit Court against Tennessee Farmers Mutual Insurance Company. They claimed that TFM was guilty of breach of contract, bad faith, fraud, and violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq*. ("TCPA"), and of the Unfair Claims Practices Act,

Tenn. Code Ann. § 56-8-105. The Sanders claimed that their damages included the $1 million judgment against their daughter as well as emotional distress resulting from "TFM's acts and/or omissions." They asked for compensatory damages of $1.5 million, punitive damages of $10,000,000, and treble damages under the TCPA. TFM answered, denying all allegations of wrongdoing.

## B. Summary Judgment on Coverage

On January 25, 2010, Plaintiffs filed a motion for partial summary judgment, seeking a declaration that the terms of the contract of insurance at issue provided liability and medical payments coverage for Claire Sanders. A statement of undisputed material facts and supporting documents were appended to the motion. Among these were the insurance policy issued to the Sanders, which included as persons covered under the policy "you or any family member for the maintenance or use of any auto or trailer." Also attached were the affidavits of Wendy Leverette, Donna Sanders, and Claire Sanders, and the depositions of Claire Sanders and Tracy Neeley. Claire Sanders' affidavit established that she was thirteen years old and living with her parents at the time of the accident. She stated that she was visiting with her friend Beth Neeley, and that,

> When it came time for our friend Paige to go back to her home, Beth's mother, Tracy Neeley, told Beth to take Paige home. While in the driveway I got in the driver's seat and Beth let me drive the car. I started driving from the time we left and continued driving until we had the wreck. Beth and Paige were in the car with me the entire time. Beth sat on the passenger side and Paige was in the back seat. No one told me that I could not drive the car.

Tracy Neeley's deposition confirmed that she sometimes allowed her sixteen year old daughter Beth to drive her car for routine errands, even though Beth did not have a drivers license. She testified that on the date of the accident, Beth, Claire, and Paige were together in Tracy Neeley's home. Tracy was cooking in the evening when Paige said she needed to go home. Tracy Neeley asked Beth to drive Paige home. She stated that she did not give Claire permission to drive her car and did not even know that Beth had allowed her to get behind the wheel. Plaintiffs nonetheless contended that Beth Neeley was in lawful possession of the car as the result of her mother's request, and that because Beth Neeley gave Claire Sanders permission to operate the car, the exclusion in the contract of insurance against those driving without the permission of a person in lawful possession of the vehicle could not be used to deny coverage to Claire Sanders.

On April 14, 2010, TFM filed a memorandum in opposition to the motion for partial summary judgment, together with excerpts from the depositions of Tracy and Beth Neeley, the transcript of Tracy Neeley's recorded telephone conversation with Frank Smith, and

answers to Plaintiffs' statement of undisputed material facts. The insurance company admitted that Beth Neeley was a passenger in her mother's car at the time of the accident, but it adhered to the position that it was not required to provide coverage for Claire Sanders because of the undisputed fact that Tracy Neeley did not give her explicit permission to drive her car.

The trial court conducted a hearing on the summary judgment motion on April 16, 2010, and it granted summary judgment to Plaintiffs in an order filed on May 6, 2010. The court stated that it had read the insurance policy, the cases cited by the parties, and the depositions and affidavits found in the record, and that it found as undisputed facts that Beth Neeley was in lawful possession of the automobile on the evening of the accident and that Beth Neeley gave Claire Sanders permission to drive the automobile. The court also noted the familiar rule that an exclusion in a policy of insurance is to be construed against the insurance company, and it concluded that as a matter of law Claire Sanders was entitled to both liability and medical payments coverage at the time of the accident under the policy at issue. All other issues raised by the pleadings were reserved for trial.[3]

## C. Other Pre-Trial Motions

The parties filed several other motions prior to trial which are relevant to this appeal. TFM filed a motion for judgment on the pleadings and/or to dismiss under Tenn. R. Civ. P. 12, on the theory that a cause of action for bad faith refusal to settle is not assignable in Tennessee, and that the Leverettes and the Sanders were not proper plaintiffs. That motion was denied. TFM also filed a motion in limine to exclude any testimony from the Leverettes about the accident, as well as a motion to amend the scheduling order to allow the testimony of its proposed expert witness to be heard. Those motions were likewise denied. Plaintiffs filed a motion to exclude from the jury any person who was employed by or insured by TFM. Their motion was granted. TFM has challenged the rulings on a variety of these motions, and they will be considered later in this opinion.

## III. THE TRIAL

The trial was conducted over three consecutive days, beginning on September 1, 2010. Because the question of coverage was decided prior to trial through the order granting partial summary judgment to Plaintiffs, their claim of bad faith against TFM was the focus of testimony, and the majority of witnesses called were current or retired insurance professionals. Plaintiffs called a few witnesses to testify as to the exact circumstances of the

---

[3]TFM filed a motion under Tenn. R. Civ. P. 9 for permission to seek an interlocutory appeal of the trial court's order of partial summary judgment, which was denied. The insurance company then filed a motion in this court under Tenn. R. Civ. P. 10 for extraordinary appeal, which was likewise denied.

accident, however, which included testimony related to the question of permission. The testimony of some witnesses came in through the reading of their depositions into the record.

The State trooper who prepared the accident report testified that he spoke to Claire Sanders, Beth Neeley, Paige Brown, and Tracy Neeley at the scene of the accident. He also spoke to Wendy Leverette in the hospital. He stated that no adjuster from TFM or any other insurance company ever contacted him concerning the accident. He said that he issued a citation against Claire Sanders for driving without a license and against Tracy Neeley for allowing an unlicensed driver to drive.

Paige Brown, the other girl in the car, testified that Claire Sanders had nagged Beth Neeley to be allowed to drive on several occasions, including the day of the accident. On that day, all three girls were standing on Tracy Neeley's porch as they were about to leave. Paige testified that when Claire asked Beth if she could drive, Beth said okay. Beth got in the passenger side of the vehicle, while Claire got in on the driver's side and Paige got in the back seat. An excerpt from the deposition of Beth Neeley that was read into the record at a later point in the proceedings confirmed this account: "She kept egging on and egging on about wanting to drive, and her grandmother had said a time before that she was a pretty good driver. And she just kept on wanting to drive, and finally I was just like, 'Whatever, go ahead.' So she got in the driver's seat and was taking Paige home."

Donna Sanders testified that she been insured by TFM for ten or eleven years, and that she had never previously filed a claim. She also testified that she was very strict with Claire, and that if she had known that her daughter was planning to drive, she would have forbidden it. She would not have allowed her to even ride in a car that Beth was driving, because she knew that Beth was not an adult.

Ms. Sanders described the emotional turmoil she and her family suffered as a result of her daughter's reckless conduct and about the injuries Claire caused to herself and to Ms. Leverette. She also testified about the shock she and her husband felt when they realized that TFM was planning to refuse coverage for Claire's medical expenses and for her liability to Ms. Leverette. That shock turned to fear when she saw the complaint that Ms. Leverette's attorney planned to file in the Bedford County Court, for she knew that she and her husband did not have the means to pay the judgment demanded. On cross-examination, TFM elicited testimony that Ms. Sanders had been advised that she and her husband would not be liable for any judgment rendered, because Claire was the only named defendant. Ms. Sanders testified that she continued to worry nonetheless.

Wendy Leverette testified about the moments before and after the collision and about the severity of her injury. She was asked about her medical expenses, and she answered (in accordance with the default judgment of the Bedford County Circuit Court that was entered

into the record) that they amounted to $70,000. She also testified that USAA, her uninsured motorist carrier, advised her to pursue her claim against TFM, and that she accordingly tried calling Frank Smith several times but that he never returned her calls. A photograph of her injured foot was entered into the record over the objections of TFM's attorney.

Plaintiffs' first expert witness was John Moyer, a retired insurance executive with forty years of experience in the industry. He testified that the purpose of automobile insurance was two-fold: first, to protect insured parties from financial ruin and to promote their peace of mind; and second, to protect the driving public from unsafe or irresponsible drivers. Mr. Moyer noted that a claims adjuster usually has greater knowledge than does any policyholder about the claims process, and that insurance companies therefore have a duty when handling insurance claims to be fair and to act in good faith for the benefit of the policyholder who has paid a premium for the service.

Mr. Moyer was questioned about application of the policy to the facts at hand. He stated that it was irrelevant whether a party insured under the policy was a minor or had a driver's license, because those conditions were not addressed in the policy. He also noted that while many terms were specifically defined in the policy, "lawful possession" was not one of them. In his opinion, lawful possession meant that the car was not stolen, but that in any case the phrase was an ambiguous one, and he cited the well-known rule of law that ambiguous terms in an insurance policy are to be construed against the insurance company.

Mr. Moyer concluded that if TFM had properly investigated the accident, it would have concluded that Claire Sanders had permission to drive. He also stated that by denying coverage to Claire Sanders, TFM showed reckless disregard for the Sanders as well as for the Leverettes "because they manufactured a permission issue that didn't even really exist." He was also asked about the Unfair Claims Practices Act, Tenn. Code Ann. § 56-8-105. He testified that the Act was a codification of insurance industry standards that all companies are supposed to abide by, and that TFM's conduct violated five of the first six specific provisions of that act. We will discuss those provisions more fully later in this opinion.

Plaintiffs also called Ronald Freemon, an attorney who had previously worked for seventeen years as a claims representative for State Farm Insurance Company. Like Mr. Moyer, he testified that the policy in question contained no exclusion for an unlicensed or minor driver, and therefore that coverage could not be denied to Claire Sanders on either of those grounds. He stated, rather, that the issue of coverage turned on the meaning of the term "lawful possession." Asked for his definition of the term, he said "if you're in lawful possession of the vehicle, it means you didn't steal the vehicle." He also testified that in his opinion, TFM showed bad faith because it did not make a full and fair investigation before denying coverage to Claire Sanders.

After the Plaintiffs rested their case, the defense read into evidence the depositions of three TFM employees, two of whom were directly involved in the decision to deny coverage to Claire Sanders. Senior claims adjuster Frank Smith testified that he was a twenty year veteran of the insurance industry, and that he handled between 600 and 700 claims a year. He described the process he followed to reach the decision in the present case. He received the report of Donna Sanders' account of the accident, which stated that Claire Sanders did not have her mother's permission to drive. He then reviewed the policy language, and after learning from his phone conversation with Tracy Neeley that she did not give Claire Sanders permission to drive her car, he concluded that there was no coverage.

When Ms. Sanders notified TFM of the accident, she told the adjuster taking the call that Claire Sanders did not have her permission to drive the vehicle and that she did not have Tracy Neeley's permission. The claims form subsequently prepared by the adjuster simply stated that she "did not have permission to drive vehicle." The claims adjuster subsequently took statements from Claire Sanders and Tracy Neeley over the phone and recorded them. The recorded statement of Tracy Neeley included an acknowledgment that she asked her daughter Beth to drive the car, and also the following:

> Q. How did it come about that, that Julia Claire Sanders was driving the vehicle?
>
> A. Uh, she kept asking my daughter to let her drive. So my daughter did.
>
> Q. Well did Julia Sanders have permission to be driving your vehicle?
>
> A. Not from me, no.
>
> Q. So who gave her permission to drive your vehicle?
>
> A. Uh, well Beth.
>
> Q. Mm. Did Beth tell her she could drive or not or did . . .
>
> A. She let her drive.

Mr. Smith then consulted with his supervisor, regional claims manager Jack Morgan Shofner and explained what he learned and what he had concluded. Mr. Shofner agreed with his decision. Mr. Smith also testified that he had a brief telephone conversation about the Sanders' claim with TFM's attorney Todd Bobo, and that the attorney agreed with Mr. Smith's decision on coverage. On cross-examination, Plaintiffs' attorney read an excerpt from Todd Bobo's deposition into the record, in which attorney Bobo testified that he did not

remember any such conversation. Mr. Smith was asked if he thought that talking to Beth Neeley could have had a bearing on his decision. He replied, "I considered it but I didn't pursue it. I didn't think it was important." He also testified that he still thought his decision to deny coverage was the correct one.

Both Mr. Smith and Mr. Shofner, whose testimony was read to the jury next, were questioned about the training TFM provided to its claims representatives, and about the procedures they were instructed to follow. They both acknowledged that TFM does not have a claims manual for its representatives and that there were no written rules or guidelines. Mr. Smith had testified that he had to take a few courses when he was first hired at TFM, but that he did not remember exactly what they were. Mr. Shofner explained that new claims representatives take a training course in Jackson, Mississippi, and then shadow a senior claims representative for three months. Representatives also attend annual conferences and seminars about new developments in the field of claims. Like Mr. Smith, Mr. Shofner insisted that TFM had reached the right decision by denying coverage to Claire Sanders.

The Defendant's final witness was Scott Walls, TFM's vice president of underwriting. He testified on direct examination that he believed the decision to deny coverage was the right one on the basis of the information that was available to Frank Smith. On cross-examination, Plaintiffs' attorney read the excerpt from Beth Neeley's deposition about Claire Sanders "egging her on" about wanting to drive and Beth allowing it, and then asked,

Q.      That sounds like Beth gave Claire permission to drive, doesn't it?

A.      Well –

A.      Yes or no?

A.      Yes, in the end reluctant permission.

Q.      Okay. Well, reluctant permission is good enough, isn't it? Isn't it?

A.      I guess so.

Q.      Okay. Now as Mr. Flynn had you point out, there's no exclusion in the policy for being underage, not having a drivers license, being foolish, stupid or even doing something against the law, is there?

A.      No, sir.

Q.      Can we agree, Mr. Walls, that if – under the exclusion language in the

policy Beth Neeley was a person in lawful possession when she let Claire drive the car, that Claire was covered?

A.    Basically based on the language, yes.

## IV.  VERDICT AND JUDGMENT

At the close of the evidence, the trial court granted Plaintiffs a directed verdict for breach of contract and awarded the Plaintiffs a total of $67,000 in damages based on the limits in the policy: $50,000 in compensatory damages for Wendy Leverette's injuries, $12,000 for her property damage, and $5,000 for Claire Sanders' medical expenses.

The jury returned from their deliberations shortly thereafter, and announced that they had reached a verdict.  The verdict was documented by answers on the jury verdict form.  In response to the first question, "[d]id Tennessee Farmers Mutual Insurance Company act in bad faith toward its insured," the jury answered that it had.  The jury also answered in the affirmative to the question whether TFM had "committed an unfair or deceptive act under the Tennessee Consumer Protection Law that caused damage to Chad and Donna Sanders, parents and guardians of Julia Claire Sanders, and Chad and Donna Sanders in their individual capacity."

The jury awarded Chad and Donna Sanders $1.2 million as compensatory damages for bad faith and $1.2 million as compensatory damages for violation of the TCPA[4]  In response to another question on the jury form, the jury responded that the TFM's acts of bad faith were committed intentionally and knowingly, which opened the door to punitive damages.

During the brief hearing on punitive damages that followed, an exhibit reflecting TFM's financial condition was entered into the record and Ed Lancaster, TFM's general counsel took the stand.  He testified that TFM was a mutual insurance company, owned by its policyholders, and that it had paid about 220,000 separate claims during the previous year. He acknowledged that the company held over $1.6 billion dollars in reserves, and he explained that the reserves were necessary to make sure that future claims could be paid.  He testified that the company only operated in the State of Tennessee, and he acknowledged the existence of six appellate decisions in the Tennessee's courts involving claims of bad faith against the company.

---

[4]The trial court had instructed the jury that Plaintiffs would not be allowed to collect damages under both bad faith and the TCPA claims, but would have to make an election of remedies.

He also testified that in the sixty years of TFM's existence, a punitive damages award had never been imposed against it and that such an award in this case would constitute a change in the law that would require the insurance company to rewrite its policies, to increase its reserves, and to recalculate its premiums. The jury then retired for deliberations, and returned a punitive damages verdict of $500,000 against TFM, which was affirmed by the trial court.

The trial court awarded the amount of the Bedford County judgment to Chad and Donna Sanders in their capacities as parents and guardians of Claire Sanders and set that amount off by the damages from the breach of contract claim. The remaining $200,000 of the compensatory damages verdict was awarded to the Sanders in their individual capacities for emotional anguish.[5]

The court filed two other judgments. In the first, the trial court recited its findings of fact and conclusions of law in regard to punitive damages, affirmed the jury verdict and awarded the Sanders an additional $500,000, in both their representative and individual capacities. In the second, the court recited findings of fact and conclusions of law in regard to Plaintiffs' claims under the Tennessee Consumer Protection Act as well as their claims for attorney fees and prejudgment interest.

Since the jury found that TFM had committed an unfair or deceptive practice, the court discussed the four factors set out in Tenn. Code Ann. § 47-18-109 for determining whether the treble damages provision should apply. It found that all four factors applied and, accordingly, trebled the award for the economic losses the Sanders had suffered individually (medical expenses and attorney fees) for a total of $18,300. The court also trebled the amount of compensatory damages awarded to Chad and Donna Sanders as parents and guardians of Julia Claire Sanders, resulting in a judgment of $3,005,535 against TFM . The court also awarded the Sanders over $1.2 million in attorney fees and prejudgment interest at the rate of 10% per year. TFM filed a motion to alter or amend the court's judgment or for a new trial, which was denied. This appeal followed.

TFM has raised eighteen issues on appeal. We have in some instances restated those issues and have organized them differently.

---

[5]The jury had awarded the Sanders $1.2 million in compensatory damages in their individual capacities and awarded zero to the Sanders "as parents and guardians of Julia Claire Sanders." In response to a motion by Plaintiffs, the trial court reallocated the damages. This "reallocation" is challenged on appeal by TFM and is the subject of another section of this opinion.

## V. COVERAGE AND BREACH OF CONTRACT

The correctness of the trial court's ruling on Plaintiffs' motion for partial summary judgment must be addressed first. If, as TFM contends, the trial court erred in ruling that Claire Sanders was entitled to insurance coverage under the policy underwritten by the insurance company, then the verdict, the judgment, and the award of damages would be of no effect. Thus, the other issues raised by TFM would be moot.

The trial court granted the Plaintiffs partial summary judgment on the issue of coverage. The standards for deciding a motion for summary judgment are well-known. The trial court may grant such a motion only if the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. West Town Mall*, 130 S.W.3d at 764. We review the summary judgment decision as a question of law. *Id.* Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair v. West Town Mall* 130 S.W.3d at 763.

The moving party has the burden of demonstrating that it is entitled to judgment as a matter of law and that there are no material facts in dispute. *Martin*, 271 S.W.3d at 83; *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998) To be entitled to summary judgment, a defendant moving party must either (1) affirmatively negate an essential element of the non-moving party's claim or (2) show that the non-moving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 9 (Tenn. 2008). If the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of a genuine issue of material fact. *Martin*, 271 S.W.3d at 84; *Hannan*, 270 S.W.3d at 5; *Staples v. CBL & Associates*, 15 S.W.3d 83, 86 (Tenn. 2000) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993))

The issue of coverage involves interpretation of the insurance policy, a contract, and, thus presents a question of law, which we review *de novo*. *Pitt v. Tyree Organization Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citing *Rainey v. Stansell,* 836 S.W.2d 117 (Tenn. Ct. App. 1992)); *Union Planters Corp. v. Harwell*, 578 S.W.2d 87, 92 (Tenn. Ct. App. 1978).

A term in a contract that is susceptible to more than one reasonable meaning is "ambiguous." *Tata v. Nichols,* 848 S.W.2d 649, 650 (Tenn. 1993). It is a basic rule of contracts that ambiguous terms in a contract are construed against the drafting party.

*Travelers Insurance Co. v. Aetna Casualty & Surety Co.*, 491 S.W.2d 363, 365 (Tenn. 1973); *Calvert Fire Insurance Co. v. American National Bank and Trust Co.*, 438 S.W.2d 545, 547 (Tenn. 1969); *Jackson v. Miller,* 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989).

As a corollary to that rule, "[i]t is well settled that exceptions, exclusions and limitations in insurance policies must be construed against the insurance company and in favor of the insured. *Allstate Insurance Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991) (citing *Travelers Insurance Co. v. Aetna Casualty & Surety Co.*, 491 S.W.2d at 367, which states that such provisions must be "strongly construed" against the insurance company); *Tennessee Farmers Mutual Insurance Co. v. Moore*, 958 S.W.2d 759, 763 (Tenn. Ct. App. 1997). *See also Harrell v. Minnesota Mutual Life Insurance Co.*, 937 S.W.2d 809, 814 (Tenn. 1996).

When a party challenges the grant of summary judgment on the basis that there exist genuine disputes of material fact, we must determine first whether factual disputes exist and, if so, whether the facts are material to the claim or defense upon which the summary judgment is predicated. *Summers v. Cherokee Family & Children Serv.*, 112 S.W.3d 486, 508 (Tenn. Ct. App. 2002). In other words, we must determine whether there exist factual disputes that must be resolved by trial before a determination on the legal issues can be made. *Id*.; *Byrd v. Hall*, 847 S.W.2d 208, 211-14 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). "If there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." *Byrd*, 847 S.W.2d at 211.

Herein, it is undisputed that the insurance policy issued to the Sanders included as persons covered under the policy "you or any family member for the maintenance or use of any auto or trailer." Thus, it is undisputed that Claire would be a covered person under this provision of the policy. However, TFM relies on an exclusion from that coverage, and the pertinent language excludes coverage:

for the use, operation or occupancy of any auto that you do not own without the permission of the owner or person or entity in lawful possession of the auto.

Therefore, the question is whether Claire was operating the car with the permission of its owner (Tracy Neely) or from someone else who was in lawful possession of the auto. The Plaintiffs did not assert that Tracy Neely gave Claire permission to operate the car, so the dispute is (1) whether Beth Neely was in lawful possession of the car, and (2) whether Beth gave Claire permission to drive it.

## A. Lawful Possession by Beth

TFM argues that there was a question of material fact as to whether Beth Neeley was ever in lawful possession of the car. This argument has two prongs. First, the insurance company contends that Beth was not actually "in possession" of her mother's car. They also argue that, even if Beth had actual possession, that possession was not "lawful," pointing out that it was unlawful for Beth Neeley to drive her mother's car because she was unlicensed and also because she was uninsured, and that it was unlawful for Tracy Neeley to allow her daughter to drive.

TFM asserts that Beth never got behind the wheel or took control of the car on that day and, consequently, was never in possession. In support of that argument, it cites Black's Law Dictionary and Webster's Dictionary which include in their definitions of possession "the exercise of dominion over property," and "the act of having or taking property into control."

Plaintiffs note, however, that Black's Law Dictionary discusses two kinds of possession: actual possession and constructive possession, stating that "[a] person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing , either directly or through another person or persons, is then in constructive possession of it." BLACK'S LAW DICTIONARY, 1163 (6th Ed. 1990).

The Tennessee Supreme Court referred to that very definition in the case of *State v. Edmondson*, 231 S.W.3d 925 (Tenn. 2007), stating that actual possession occurs when a person "knowingly has direct physical control over a thing, at a given time." *Edmondson*, 231 S.W.3d at 928. Constructive possession occurs when a person "knowingly has both the power and the intention at a given time to exercise dominion or control over a thing . . . ." *Id*.

In *Edmondson*, the Court held that a victim of a carjacking was in possession of an automobile when the defendant forcibly demanded the car keys from her, even though the victim was three car lengths from the vehicle at the time of the encounter. The court also stated that "[w]e agree with the Defendant that a person is in actual possession of his or her car when in, on, or immediately adjacent to it." *Edmondson*, 231 S.W.3d at 928. The argument by TFM raises a question of law and does not involve a factual dispute. We conclude that Beth was in possession of the car. Her mother gave her permission to operate and take control of it.

TFM, argues, however, that even if Beth Neeley was in possession of the car, the question of whether that possession was "lawful" remains unanswered. The insurance company points out that it was unlawful for Beth Neeley to drive her mother's car because she was unlicensed and also because she was uninsured, and that it was unlawful for Tracy Neeley to allow her daughter to drive.

Although we have been unable to find a Tennessee case that is on point, Plaintiffs have directed our attention to a number of cases from other jurisdictions in which the courts have interpreted the meaning of legal possession within the context of an exclusion in an automobile insurance policy. For example, *Oakes v. American Family Mutual Insurance Co.*, 535 N.W.2d 120 (Wisc. 1995), like the present case, also featured an accident caused by an unlicensed minor driver, and an argument by the insurance company that the minor driver was not covered under a relative's policy because he was not in lawful possession of the vehicle.

In its review of a summary judgment in that case, the Wisconsin court was required to determine the meaning of "lawful possession," because that term was not defined in the insurance policy. The court consulted Webster's Dictionary, and concluded that the term "is susceptible to one reasonable construction in the context of this policy: a person who has lawful possession of a vehicle is a person who has a right to use the vehicle. To obtain that right, the individual must be either: (1) a person with legal title to the vehicle; (2) a person who has permission to use the vehicle from the titled owner; or (3) a person who has permission to use the vehicle from another person who has permission to use it from the titled owner." *Oakes v. American Family Mutual Insurance Co.*, 535 N.W.2d at 123.

Of course under that definition, there would be no question as to whether Beth Neeley was in lawful possession of the vehicle, for she had permission from the titled owner to drive it.[6] Plaintiffs also cite the case of *Stanley v. Nationwide Insurance Co.*, 321 S.E. 920 (N.C. App. 1984). The driver in that case borrowed a car from his brother by falsely representing to him that his revoked license had been restored. Shortly thereafter, he collided with another car. The appeals court found that the driver was in legal possession of the car because he had the owner's permission, notwithstanding his misrepresentation and his invalid license.

For its part, TFM cites the case of *Campbell v. Old Republic Insurance Co.*, 978 So.2d 416 (La. App. 2007). In that case, a fifteen year old unlicensed driver took his grandfather's company truck without permission and collided with an eighteen-wheeler. The trial court found that on the basis of the driver's age and his lack of a license, his "possession and

---

[6]The Wisconsin court reached a different result than did the court in this case, affirming the summary judgment for the insurance company because the only possible permission the minor driver in that case obtained came from a friend who had no right to drive or possess the car himself.

operation of the vehicle was not lawful," and that his operation of the car without the owner's permission simply added to the unlawfulness. *Campbell v. Old Republic Insurance Co.*, 978 So.2d at 418.

TFM suggests that the different meanings ascribed to lawful possession in the above cases raise questions of material fact which would preclude summary judgment on the question of coverage. However, the interpretation of a written contract is a matter of law and not of fact. *Pitt v. Tyree Organization Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citing *Rainey v. Stansell,* 836 S.W.2d 117 (Tenn. Ct. App. 1992)); *Union Planters Corp. v. Harwell*, 578 S. W.2d 87, 92 (Tenn. Ct. App. 1978). It appears to us that TFM's arguments only prove that the terms "possession" and "lawful possession" can be reasonably interpreted in more than one way. "It has long been the rule in this state that in construing an insurance policy, uncertainties or ambiguities must be construed strongly against the insurer and in favor of the insured." *Travelers Insurance Co. V. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 367 (Tenn. 1973) (emphasis added).

Since it is undisputed that Tracy Neeley asked Beth Neeley to drive her car, Beth can reasonably be deemed to have been in "lawful possession" of the vehicle.

### B. Permission

In the present case, TFM does not dispute that Tracy Neeley gave her daughter Beth permission to drive her car, or that Beth Neeley in turn allowed Claire Sanders to get behind the wheel. Nor does the insurance company dispute that Beth sat in the passenger seat beside Claire from the time they left Tracy Neeley's driveway until the accident occurred. The insurance company argues, nonetheless, that certain filings they submitted with their memorandum in opposition to summary judgment raise a genuine issue of material fact as to whether Beth Neeley actually gave Claire Sanders permission to drive.

In support of its theory, TFM relies on the loss report prepared by the insurance adjuster, which recited that Donna Sanders' daughter "did not have permission to drive vehicle," and a single response by Claire Sanders to a deposition question about permission.

We note that the loss report was not authenticated by an affidavit attesting to the truth of the matters contained therein, or that the information it recited was made on personal knowledge. *See* 56.06 Tenn. R. Civ. P. Further, even a casual examination of the report reveals that it cannot be competent evidence because it amounts to double or triple hearsay. It is a written statement prepared by the insurance adjuster, summarizing an account of an accident conveyed to him by the 800 operator who had spoken to Tracy Neeley, but not to anyone who was actually in the car prior to the time of the accident. Such a document does not satisfy the requirements of Tenn. R. Civ. P. 56.06 for the purpose of establishing the

-18-

existence of genuine issues of material fact for trial.  See *Newman v. Jarrell,* 354 S.W.3d 309, 317 (Tenn. Ct. App. 2010); *Perlberg v. Brencor Asset Management, Inc.*, 63 S.W.3d 390, 397 (Tenn. Ct. App. 2001); *Byrd v. Hall,* 847 S.W.2d at 215-216.

TFM also insists that an answer Claire Sanders gave to a question she was asked about the accident at her deposition raises a material question of fact as to whether Beth Sanders gave her permission to drive.  We note that Claire first testified that as she and Beth were walking outside, she told Beth, "I want to drive and Beth said 'Okay,'" and that Claire then got in the driver's side.  The keys were already in the ignition.  Claire was asked about the immediate aftermath of the accident, and she testified that she made a phone call, which brought her father, her mother and her brother to the scene of accident.  She was then asked,

> Q.     Did you tell your mother or father, either one, that you had permission to drive the car?
>
> A.     No.
>
> Q.     Did you think you had permission to drive the car?
>
> A.     No.
>
> Q.     And is that because you knew you weren't supposed to be driving the car?
>
> A.     Yes, sir.

TFM invokes the well-known rule that on a motion for summary judgment, the trial court must view the pleadings and the evidence before it in the light most favorable to the opponent of the motion.  *See Keene v. Cracker Barrel Old Country Store*, 853 S.W.2d 501, 503 (Tenn. Ct. App. 1992); *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476 (Tenn. Ct. App. 1978).  It insists that Claire's answer to the question "[d]id you think you had permission to drive the car?" created a question about her credibility, and raised a genuine issue of material fact about whether she received permission to drive, which should have precluded summary judgment.

But TFM has taken her answer out of context.  Earlier in her deposition, Claire Sanders acknowledged that she knew that her parents would not have agreed to let her drive and that Tracy Neeley did not know she took the wheel.  She also testified, both before and after the single response relied upon by TFM, that she told Beth she wanted to drive and that Beth said "Okay."  In the context of the questions she was asked, it is clear to us that the answer TFM relies on does not contradict Claire's other testimony, but simply demonstrates

that Claire understood the wrongfulness of driving without the permission of her parents and of the car's owner.

There is no dispute of material fact that would preclude summary judgment. We hold that Claire Sanders was driving the car with the permission of a person in lawful possession. Therefore, we conclude that the trial court was correct to find that there was no question of material fact as to insurance coverage and that Plaintiffs were entitled to summary judgment on that issue as a matter of law.

## C. Breach of Contract

Following close of all evidence, the trial court found that TFM breached its insurance contract by denying coverage and awarded compensatory damages in the amount of $50,000 and $12,000 to the Sanders, parent and guardians of Claire, and the Leverettes. It also awarded $5,000 for medical payments to the Sanders, in their individual capacity, for expenses incurred in the treatment of Claire's injuries.

Because we have concluded that the policy provided coverage, we agree that TFM breached the contract by denying coverage. We affirm the holding of the trial court on the breach of contract claim.

## VI. BAD FAITH CLAIMS

In addition to their claim for breach of contract, the Plaintiffs specifically alleged that the acts or omissions of TMF "constitute the tort of bad faith." They also alleged that TFM "committed unfair claims practices in violation of T.C.A. Sections 56-8-101 through 56-8-111," and they specifically listed alleged violations of Tenn. Code Ann. § 56-8-105.

## A. The Insurance Trade Practices Act

The Plaintiffs' assertion of "unfair claims practices" is, by the language of their Complaint, based upon the Insurance Trade Practices Act, Tenn. Code Ann. §§ 56–8–101 *et seq*. The purpose of the Act is

regulat[ing] trade practices in the business of insurance . . . by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

Tenn. Code Ann. § 56–8–101.

The Act contains a list of acts that constitute unfair competition or deceptive acts in the insurance business, including "unfair claim settlement practices." Tenn. Code Ann. § 56–8–104(8). The Act focuses on the comprehensive regulation of insurance industry practices and gives the Commissioner of Commerce and Insurance broad authority to enforce its provisions. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998). However, no private right of action may be maintained under the Act. *Id*.

The Supreme Court's holding that the Insurance Trade Practices Act, Tenn. Code Ann. §§ 56–8–101 *et seq*., does not create a private right of action has been applied in a number of federal court decisions. *See*, *e.g*., *Kansas Bankers Sur. Co. v. Bahr Consultants, Inc*., 69 F. Supp. 2d 1004, 1017-18 (E.D. Tenn. 1999); *Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636, 649 (W.D. Tenn. 1999); *Pemberton v. AMOCO Life Ins. Co., Inc*., 2002 WL 32059028, at *7 (E.D. Tenn. February 15, 2002).

Accordingly, if the Plaintiffs intended to bring a separate claim based upon the alleged violations of the Insurance Trade Practices Act, Tenn. Code Ann. §§ 56–8–101 *et seq*., that claim must be dismissed. However, it appears that although Plaintiffs alleged that TFM had violated provisions of that Act, specifically § 56-8-105, they did not seek any relief on the basis of those violations. In any event, the trial court's orders do not indicate that any liability was assigned to TMF for violations of the Act *per se,*[7] and no damages were attributed to that cause of action.

## B. Statutory Bad Faith

There is, however, a different statutory basis for a bad faith claim by an insured against his insurer.

> While the Insurance Trade Practices Act focuses on the comprehensive regulation of insurance industry practices, the bad faith statute, Tenn. Code Ann. § 56-7-105, focuses on specific instances of bad faith. Enacted in 1901, the bad faith statute provides a private right of action to an individual injured by an insurance company's refusal to pay a claim, if the refusal "was not in good faith."

*Myint*, 970 S.W.2d 920 at 925.

The statute known as the "bad faith penalty" statute applies to insurers and provides:

---

[7]As discussed later in this opinion, it appears to us that Plaintiffs intended that we consider the provisions of the Act as providing specific legislative examples of unfair and deceptive practices in the context of the TCPA claim.

The insurance companies of this state . . . in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy . . . on which the loss occurred, shall be liable to pay the holder of the policy . . . , in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that **the refusal to pay the loss was not in good faith**, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy . . . ; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105 (a) (emphasis added).

As this language makes clear, the statute provides for a 25% penalty where refusal to pay the claim is not made in good faith. *Gaston v. Tennessee Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 822 (Tenn. 2003) (reversing the trial court's grant of directed verdict dismissing the statutory bad faith claim, because a reasonable jury could find the insurer's conduct constituted bad faith under the statute).

However, in the case before us, a careful review of the Complaint reveals that Plaintiffs did not allege liability under Tenn. Code Ann. § 56-7-105. Moreover, in this appeal they do not assert they made a claim under the statute. Nothing in the trial court's instructions or orders indicates a cause of action based upon the bad faith statute. Instead, by submitting the question of punitive damages to the jury and approving the award of punitive damages for bad faith, rather than the 25% statutory penalty, it is clear that any "bad faith" liability was based on Plaintiff's claim for "the tort of bad faith," as stated in the Complaint.

### C. Tort of Bad Faith

In the case before us, the jury and the trial court awarded the Plaintiffs both compensatory and punitive damages based upon TMF's liability for the "tort of bad faith." However, this court has held that Tennessee does not recognize the tort of bad faith in suits between an insured and her insurer where the actions complained of are covered by the bad faith penalty statute.

In *Chandler v. Prudential Insurance Co.*, 715 S.W.2d 615 (Tenn. Ct. App. 1986), the plaintiff originally brought an action based upon the bad faith statute, but later took a voluntary nonsuit on that claim and, instead, proceeded on a claim that the insurance

company's actions "constituted the tort of bad faith." *Id.* at 619. This court described the plaintiff as seeking

> to have this Court decide - **for the first time** - that the tort of bad faith exists in Tennessee insofar as an action between an insured and its insurer is concerned. . . . Plaintiff concedes that such is presently not the law in Tennessee.

*Id.* (emphasis added).

This court declined to recognize such a tort, holding that the bad faith statute, Tenn. Code Ann. § 56-7-105, provides the exclusive remedy for an insurer's failure to pay a claim in bad faith. *Id.* In addition to the facts that the tort had not been recognized in this state and that the statute had existed for many years, the *Chandler* court found the statute's use of the words "**in all cases**" when an insurance company refuses to pay a loss not in good faith indicative of the legislature's intent that the statute be the exclusive remedy where an insured's claim is based upon the insurer's refusal to pay a claim. *Id.* at 621 (emphasis in original).[8] Federal courts in this state and a subsequent opinion from this court have repeated the *Chandler* holding. *See, e.g.*, *Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 590 F. Supp.2d 970, 972 (M.D. Tenn. 2008) ("Tennessee does not recognize a general common law tort for bad faith by an insurer against an insured; the exclusive remedy is statutory."); *Rice v. Van Wagoner Co., Inc.*, 738 F. Supp. 252, 253 (M.D. Tenn. 1990); *Watry v. Allstate Prop. and Cas. Ins. Co.*, 2011 WL 6916802, at *4 (Tenn. Ct. App. Dec. 28, 2011).

Neither this court nor the Tennessee Supreme Court has overruled or even questioned the continuing validity of *Chandler*. Neither court has explicitly recognized a tort based upon an insurer's bad faith in situations covered by the bad faith penalty statute. A number of cases have dealt with the application, interpretation, and requirements for stating a claim under the statute. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 822 (Tenn. 2004); *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 442-43 (Tenn. Ct. App. 2004); *Stooksbury v. Am. Nat. Prop. and Cas. Co.*, 126 S.W.3d 505, 518-19 (Tenn. Ct. App. 2003); *Minton v. Tenn. Farmers Mut. Ins. Co.*, 832 S.W.2d 35, 37-38 (Tenn. Ct. App. 1992); *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 125-26 (Tenn. Ct. App. 1986); *see also Pactech, Inc. v. Auto-Owners Ins. Co.*, 292 S.W.3d 1, 9 (Tenn. Ct. App. 2009).

The Plaintiffs herein assert that the holding of *Chandler* regarding the exclusivity of the statutory remedy is no longer good law and that "the Tennessee Supreme Court has

---

[8]The court likened this language to the "exclusive remedy" language in the Workers' Compensation laws.

expressly recognized the tort of bad faith," citing *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006).[9]  We have carefully reviewed the opinion in *Johnson* and find no express recognition of the tort of bad faith in situations that fall within the parameters of the statute.

To the contrary, *Johnson* and the cases cited therein address the duty of an insurance company to settle within policy limits.  In that situation, the insurer has not refused to pay a claim, so the bad faith statute is not applicable.  Instead, the insurer has already acknowledged coverage and liability and has undertaken to provide a defense for the insured in suits or actions by third parties.

It has long been the law in this state that an insurance company has a special duty to its insureds after it undertakes defense of a claim against those insureds.  *Johnson* and its predecessors recognize that duty.  "It is well established that an insurer having exclusive control over the investigation and settlement of a claim may be held liable to its insured for an amount in excess of its policy limits if as a result of bad faith it fails to effect a settlement within the policy limits." *Johnson*, 205 S.W.3d at 370 (citing *State Auto. Ins. Co. of Columbus, Ohio v. Rowland*, 427 S.W.2d 30, 33 (Tenn. 1968)).

The *Johnson* Court explained:

> Bad faith refusal to settle is defined, in part, as an insurer's disregard or demonstrable indifference toward the interests of its insured. This indifference may be proved circumstantially.  Bad faith on the part of the insurer can be proved by facts that tend to show a willingness on the part of the insurer to gamble with the insured's money in an attempt to save its own money or any intentional disregard of the financial interests of the plaintiff in the hope of escaping full liability imposed upon it by its policy.  If the claim exceeds the policy limits, then the insurer's conduct is subject to close scrutiny because there is a potential conflict of interest between the insurer and the insured.

---

[9]Plaintiffs also refer us to *MFA Mutual Ins. Co. v. Flint*, 574 S.W.2d 718 (Tenn. 1978), and describe this case as a "first party case brought directly by the insured against the insurer."  The plaintiff *Chandler* similarly argued that the Tennessee Supreme Court had recognized the tort of bad faith in *Flint*.  The *Chandler* court disagreed with that interpretation, *Chandler*, 715 S.W.2d at 621, and we agree with the *Chandler* interpretation.  In *Flint*, the plaintiff brought an action to rescind or reform releases he had signed with the insurance company on the ground that the settlement and releases were obtained in bad faith and in breach of the insurer's fiduciary duty to the insured.  *Id*.  The Chandler found *Flint* inapplicable to the request that it recognize the tort, stating "*Flint* was a contract action.  It sought a contractual type of relief, rescission of releases for fraudulent inducement and acts of bad faith on the part of the insurer." *Chandler*, 715 S.W.2d at 621. The *Chandler* court noted that the Supreme Court had not stated that it was acknowledging the tort of bad faith.

*Johnson,* 205 S.W.3d at 370 (internal citations omitted). All the cases cited by the *Johnson* Court that describe the special duty owed by insurers involve allegations of a failure to settle within the policy limits, obviously after the duty to defend has been acknowledged. *See, e.g., State Auto. Ins. Co. of Columbus, Ohio v. Rowland*, 427 S.W.2d 30, 33 (1968); *Perry v. U.S. Fid. & Guar. Co.*, 359 S.W.2d 1, 6-7 (1962)*; S. Fire & Cas. Co. v. Norris*, 250 S.W.2d 785, 790–91 (1952); *Goings v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 847, 849 (Tenn. Ct. App. 1972); *see also Brown v. St. Paul Fire and Marine Ins. Co.*, 604 S.W.2d 863, 865 (Tenn. Ct. App. 1980); *Clark v. Hartford Accident and Indem. Co.*, 457 S.W.2d 35, 38 (Tenn. Ct. App. 1970).

In that situation, there is no refusal to pay a claim, so the statute does not apply. Consequently, there is no conflict or inconsistency[10] between, on one hand, *Johnson* and the prior cases dealing with the duty specifically applicable to situations where the insurer has undertaken to defend its insured, and, on the other, *Chandler* and other cases involving application of the statute where the insurer has refused to defend a claim.

## VII. TENNESSEE CONSUMER PROTECTION ACT CLAIMS

In the verdict form submitted to it, the jury herein was asked, "Do you find that the Defendant committed an unfair or deceptive act or practice under the Tennessee Consumer Protection Law that caused damage to Chad and Donna Sanders parents and guardians for Julia Claire Sanders, or Chad and Donna Sanders in their individual capacity?" The jury answered the question in the affirmative and awarded $1.2 million in compensatory damages to the Sanders.[11]

The acts and practices of insurance companies are subject to the application of the Tennessee Consumer Protection Act. *Myint v. Allstate Insurance Co.*, 970 S.W.2d 920, 925 (Tenn. 1998). The TPCA is complementary to the bad faith penalty statute, *Id*., and the same conduct may be found to violate both. *Gaston v. Tennessee Farmers Mutual Insurance Co. (Gaston I)*, 120 S.W.3d at 822 (restating that causes of action arising under TCPA may be cumulative to other statutory remedies, and considering both the statutory bad faith claim and the TCPA claim).

The provisions of the TCPA are to be "liberally construed" to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices

---

[10]Plaintiffs requested that we "clear up the inconsistency among *Chandler* , *Johnson*, [and] *Myint* . . . ."

[11]The jury made this award to the Sanders in their individual capacity. The trial court reallocated the damages, and that action is the subject of a separate issue raised by TFM discussed later in this opinion.

in the conduct of any trade or commerce. . . ." T.C.A. § 47-18-102(2); *Ginn v. American Heritage Life Ins. Co.*, 173 S.W.3d 433, 444 (Tenn. Ct. App. 2004).  The TCPA creates a private right of action:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. §47–18–109(a)(1); *Discover Bank v. Morgan*, 363 S.W.3d 479 (Tenn. 2012);  *Morrison v. Allen*, 338 S.W.3d 417, 437 (Tenn. 2011).

Tennessee Code Annotated § 47–18–104(a) declares unlawful any "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce."  Subsection (b) of that statute provides a lengthy, non-exclusive list of acts and practices that are "unfair or deceptive."  Many of those are specific to particular types of businesses or industries, none of which are applicable in this case.  The specific acts or practices enumerated in Tenn. Code Ann. § 47-18-104(b) include a "catch-all" provision, *i.e.*, "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann § 47-18-104(b)(27).[12]

Additionally, the list in subsection (b) is qualified by the statement that the list of specific unfair acts or practices does not limit the scope of subsection (a).  This clear language means simply that there can be unfair or deceptive acts or practices other than those specifically set forth in Tenn. Code Ann. § 47-18-104(b). *Gaston v. Tennessee Farmers Mut. Ins. Co.* (*Gaston II*), 2007 WL 1775967, at *11 (Tenn. Ct. App. June 21, 2007) (citing *Roberson v. West Nashville Diesel, Inc.*, No. M2004-01825-COA-R3-CV, 2006 WL 287389, at *6 (Tenn. Ct. App. February 3, 2006)).

> "[T]he standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts. However, whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (citations omitted). "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that

---

[12]This catch-all provision was amended in 2011, effective October 1, 2011, to add the following at the end of the provision, "provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter and the director of the division." Tenn. Pub. Acts 2011, ch. 510, §§ 15, 19.

misleads or tends to mislead a consumer as to a matter of fact." *Id*. An act or practice is unfair where " 'the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.' " *Id*. at 116–17 (quoting 15 U.S.C.A. § 45(n)).

*Morrison v. Allen*, 338 S.W.3d at 437 (citations omitted).

### A. Could TFM's Alleged Conduct Be a Violation the TCPA ?

We must first determine whether the conduct alleged to have been a violation of the TCPA fits within the Act such that it was proper to allow the question of violation to go to the jury instead of granting a directed verdict to TFM. *See*, *e.g. Gaston I,* 120 S.W.3d at 822 (reversing the trial court's grant of directed verdict to insurance company because a jury could reasonably conclude that the insurer's conduct was unfair or deceptive under the TCPA).

The conduct of TFM does not fit into any one of the specific enumerated acts or practices declared to be unlawful under the TCPA, in Tenn. Code Ann. § 47-18-104(b). The "catch-all" provision, *i.e.*, "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person," Tenn. Code Ann § 47-18-104(b)(27), does not apply, either, because it is clearly limited to "deceptive" conduct. We find no basis in the allegations or proof that TFM enagaged in any deceptive conduct.

That leaves the question of whether TFM's conduct in how it handled the Sanders' claim could constitute unfair acts or practices other than those specifically listed in Tenn. Code Ann. § 47-18-104(b).

An insurance company may be found to have breached its insurance contract, but that holding does not necessarily establish an unfair act or a violation of the TCPA. For example, in *Myint* the insurance company refused to pay on a claim due to the suspicious nature of the cause of two fires which ultimately resulted in substantial damage to the plaintiffs' property. It was stipulated by the parties that both fires were set intentionally, but the plaintiffs steadfastly denied that they set the fires. In determining whether the denial of the plaintiffs' insurance claim constituted a violation of the TCPA, the Court stated:

> While the sale of a policy of insurance easily falls under this definition of "trade" and "commerce," we conclude that Allstate's conduct in handling the Myints' insurance policy was neither unfair nor deceptive. The record reveals no evidence of an attempt by Allstate to violate the terms of the policy, deceive the Myints about the terms of the policy, or otherwise act unfairly. It is

apparent that the denial of the Myints' claim was Allstate's reaction to circumstances which Allstate believed to be suspicious. Consequently, Allstate's conduct does not fall within the purview of the Tennessee Consumer Protection Act, and the Myints are not entitled to the benefits of treble damages and attorney's fees recoverable under the Act.

*Myint v. Allstate Ins. Co.*, 970 S.W.2d at 923. Similarly, in *Ginn v. American Heritage Life Insurance Co.*, this court examined the conduct that the plaintiff alleged supported the jury's finding of a violation of the TCPA, 173 S.W.3d at 445, holding as to at least one allegation, "We fail to see how this even remotely states a cause of action under the TCPA." *Id*. The court stated:

Plaintiff's husband had a valid life insurance contract, and Defendants have never questioned that with the sole exception being whether Plaintiff made material misrepresentations about her husband's health. Today we reach the same ultimate conclusion reached by this Court in *Stooksbury* and by our Supreme Court in *Myint*. We conclude there was no unfair or deceptive conduct by Defendants when the insurance contract was entered into; there was no unfair or deceptive conduct by Defendants when handling Plaintiff's claim; there was no evidence of an attempt by Defendants to violate the terms of the policy; and Defendants had substantial legal grounds to support their defense to Plaintiff's claim for benefits.

*Id*. [13]

There have also been situations in which the courts determined that an insurance company's actions were unfair or deceptive in violation of the TCPA. In *Gaston I* the Supreme Court held that a juror could reasonably conclude that the insurer had acted in an "unfair" manner in dealing with the plaintiff, explaining:

Neither Brown nor anyone else at Tennessee Farmers notified or informed Gaston, who was not represented by counsel, that her effort to settle with CNL would prohibit her from collecting under her own policy. In our view, a jury could reasonably conclude that Tennessee Farmers' conduct was unfair or deceptive under the TCPA.

---

[13]The court went on to find there was no substantial and material evidence anywhere in the record to support a verdict for Plaintiff pursuant to the TCPA. Its decision, however, was essentially a holding that no conduct shown met the requirements of an unfair or deceptive practice.

*Gaston I*, 120 S.W.3d at 822. On remand, based upon those same facts, the trial court found that the insurer treated its insured "unfairly in failing to advise her that the actions that she was taking could impair her rights under her insurance policy." This court affirmed that holding. *Gaston II*, 2007 WL 1775967, at *11.

In the case before us, the Plaintiffs do not assert that the denial of coverage itself was a violation of the TCPA. We agree that our affirmance of the trial court's determination that the policy provided coverage to Claire Sanders at the time of the accident does not mean that denial was somehow unfair. However, the Plaintiffs herein relied upon sections of the Unfair Claims Practices Act, discussed earlier in this opinion, to establish TFM's unfair acts. Specifically, Tenn. Code Ann. § 56-8-105 sets out a list of fifteen types of "acts by an insurer or person" that constitute unfair claims practices. The Plaintiffs and their expert alleged that TFM committed certain of those enumerated acts.

Since Tenn. Code Ann. § 47-18-104(b) declared that the extensive list it contained was not exclusive and did not limit "the scope of subsection (a)," of the TCPA, the Plaintiffs were entitled to allege other "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). The legislature has identified specific acts or practices by insurance companies that are unfair claims practices. We conclude that violation of those statutory provisions can also constitute violation of the TCPA. Accordingly, the jury was appropriately assigned the task of determining whether the conduct of TFM was an unfair act or practice prohibited by the TCPA.

### B. Jury Verdict

The standard of review an appeals court must follow in reviewing a jury verdict is set out in the Rules of Appellate Procedure. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). When addressing whether there is material evidence to support a verdict, this court is required to: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all countervailing evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

Therefore, our task is to determine whether there is any material evidence in the record to support the jury's finding that TFM committed an unfair or deceptive act or practice under the TCPA that caused damage to the Sanders.

Plaintiffs' expert witness John Moyer testified that the conduct of the insurer in the case before us presented prime examples of five unfair practices found in the statutes regulating the insurance industry at Tenn. Code Ann. § 56-8-105. He identified those practices as:

> (1) Knowingly misrepresenting relevant facts or policy provisions relating to coverages at issue;
> (2) Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;
> (3) Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies;
> (4) Except when the prompt and good faith payment of claims is governed by more specific standards, not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;
> . . .
> (6) Refusing to pay claims without conducting a reasonable investigation except when denied because of an electronic submission error by the claimant;

Mr. Moyer explained the reasons why, in his opinion, TFM was guilty of all the unfair acts listed above. While the insurer may dispute Mr. Moyer's conclusion that its acts were in violation of numbers (1) and (4), it admitted that it's conduct violated numbers (2) and (3). It does not deny that it failed to acknowledge or respond to pertinent communications about the claim before it from the Sanders, their representatives and other interested parties and it admitted that it had not implemented uniform written standards for the prompt investigation and settlement of the millions of claims that it administered.

TFM argues that its investigation was reasonable under the circumstances, but we conclude there was evidence from which the jury could have found otherwise. The adjuster's original decision was based upon an incomplete investigation that disclosed, at most, that neither the Sanders, Claire's parents, nor Tracy Neely, the car's owner, had given Claire permission to drive. The adjuster ignored, or did not investigate, whether another person, *i.e.*, someone in possession of the car, had given her permission. The insurer stuck to its original position and did not explain its interpretation of the policy to the insureds or to the Leverettes' attorney.

## C. Enhanced Penalties

The trial court enhanced Plaintiffs' damages award under the provisions of Tenn. Code Ann. § 47-18-109 of the TCPA. That statute allows the court to award a plaintiff three times the actual damages sustained, if it finds that the defendant has committed an unfair or deceptive act or practice prohibited by the TCPA., and if such violation was willful or knowing. The definitions section of the TCPA defines "knowingly"or "knowing"as "actual awareness of the falsity or deception, but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception." Tenn. Code Ann. § 47-18-103(10).[14]

The court's authority to enhance an award beyond actual damages is found in Tenn. Code Ann. § 47-18-109, which provides:

> (3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper, except that the court may not award exemplary or punitive damages for the same unfair or deceptive practice.
>
> (4) In determining whether treble damages should be awarded, the trial court may consider, among other things:
>
> (A) The competence of the consumer or other person;
> (B) The nature of the deception or coercion practiced upon the consumer or other person;
> (C) The damage to the consumer or other person; and
> (D) The good faith of the person found to have violated the provisions of this part.

---

[14]The jury was asked, "[w]as the Defendant's unfair or deceptive act or practice committed willfully or knowingly?" and answered in the affirmative. On appeal, TFM argues that it was error to submit that issue to the jury, since the statute, Tenn. Code Ann. § 47-18-109(3),requires that the "court" make that determination. Plaintiffs argue that TFM did not lodge any objections to the jury instructions or the jury verdict form in relation to their TCPA claims and, therefore, should not be permitted to raise this issue for the first time on appeal. They ask us to rule that any such objection has been waived. *See Dye v. Witco Corp.*, 216 S.W.3d 317, 321 (holding that issues raised for the first time on appeal are waived). We need not make that determination, however, because, as Plaintiffs point out, even if the trial court erred in submitting the question to the jury, the court remedied that error by making its own determination on the issue. The court's judgment on treble damages explicitly declares that, "[t]he court, having heard and independently weighed the evidence agrees with the jury's finding that the Defendant committed unfair and deceptive practices in violation of the TCPA, and did so willfully and knowingly." Since the court made it clear that it performed its independent statutory duty to determine that question, any error was harmless at most.

The trial court herein discussed the four factors listed above, and found that they all were present. It accordingly held that the Sanders were entitled to a treble damages award for their "proven actual economic damages."[15] The court's specific findings include:

(1) Here there is evidence that the Defendant deceived Plaintiffs with regard to the investigation of the claim and interpretation of the exclusionary language relied upon by the insurance company. At trial Plaintiffs produced expert testimony tending to prove that the representations made in the Defendant's denial letter that was sent to Plaintiffs contained untrue and deceptive statements.

(2) Clearly the Plaintiffs have suffered extensive economic harm. Claire Sanders has suffered judgments against her in Bedford County totaling in excess of $1,000,000.00. Mr. And Mrs. Sanders, individually, suffered medical expenses and out of pocket costs for retention of an attorney.

(3) The jury specifically found the defendant guilty of bad faith and the court agrees.

After carefully reviewing the record, we must conclude that the evidence preponderates against the trial court's findings of fact and/or that the evidence does not support the holdings. With regard to deception, the evidence preponderates against the finding that deceit was involved. We have already held that the insurer's conduct herein did not implicate the "deceptive act or practice" element of the TCPA. The fact that the insurance company interpreted its policy differently from the insureds does not make their interpretation deceitful.

With regard to harm, it is inevitable that in a coverage denial situation, the insureds will suffer economic harm, whether the coverage was denied on a reasonable basis or not. We find nothing in the record to indicate that the Plaintiffs' situation was graver than others

---

[15]Once an ascertainable loss has been established, the TCPA allows consumers to recover "actual damages," Tenn. Code Ann. § 47–18–109(a)(1). The trial court applied treble damages to $5,000 of the medical costs the Sanders had to incur for their daughter's injuries, and the attorney fees of $1,100 they expended after TFM refused to defend their case in the Bedford County action. The resulting award to the Sanders in their individual capacity amounted to $18,300. The court also held that the Sanders were entitled to a treble damages award as parents and guardians of Julia Claire Sanders for her economic damages of $1,001,845, resulting in a total award to them in that capacity of $3,005,535.

or warranted trebling of the damages actually suffered by them.

We have vacated the jury's and the trial court's holding that TFM committed the tort of bad faith. While that holding does not eliminate consideration of specific conduct that was found to be in bad faith, there is little identification of what that specific conduct was. In any event, the trial court also included another factor that is relevant:

(4) Other facts and considerations the court may consider are all of the separate factors considered by the court in weighing the jury's assessment of punitive damages. That is the _Hodges v. S.C. Toof Co._, 833 SW2d 901 (Tenn. 1992) factors may be considered by the court. The court has previously considered those factors and its findings are set forth in a previous order entered in this cause.

As to the factors set out by the trial court in its order on punitive damages, the most relevant findings are:

It is clear to the court that the Defendant has been in continuous violation of insurance industry standards by its failure to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies during its entire corporate existence.

While there is no evidence of prior punitive damage awards against this Defendant, it is also clear from the evidence that the Defendant has been guilty of bad faith on multiple prior occasions from conduct similar to that in this case which is bad faith refusal to settle within policy limits. There was no evidence that any change in policy or procedure was made by the Defendant in response to any of the prior bad faith findings.

While TFM admitted it had not adopted the type of standards referenced by Plaintiffs' experts, it is not clear at all that the lack of standards for prompt investigation and settlement of claims had anything to do with TFM's decision on coverage or its interpretation of its policy language. Even though we held that there was some material evidence in the record to support the jury's verdict that TFM committed a violation of the TCPA, we cannot see that the evidence supports a knowing and willful violation or supports the trebling of damages.

The basis of the finding that TFM has been guilty of bad faith "on multiple prior occasions from conduct similar to that in this case" requires some explanation. As a result of the reading into the record of a request for admission and TFM's response, copies of six

(6) appellate opinions in which TFM was a party were introduced into evidence.[16]

John Moyer, Plaintiffs' expert, was asked if he had detected a pattern of bad behavior on the part of TFM with respect to the handling of its policyholders' claims. He testified that while reviewing the facts of this case, he had also examined the six cases mentioned above, and he stated that although those cases were filed over a period of thirty or forty years, they did demonstrate such a pattern.

Under cross-examination, Mr. Moyers once again acknowledged that the six cases were filed over a period of thirty or forty years, but he maintained that they still constituted a significant number of adverse appellate opinions on the question of bad faith. He was then asked if he would be surprised to learn that TFM had handled more that two and a half million auto claims since the 1980's, and he said that he would not be. He also admitted that in his experience in the insurance industry, it was not unusual for attorneys to claim bad faith when the insurance company did not give them the result they wanted.

TFM's general counsel acknowledged the six cases and also testified that TFM had paid over 220,000 claims in the previous year.

Whether or not the prior adverse decisions were appropriate as evidence, which, of course, the parties dispute, we cannot conclude that they actually establish a pattern of bad faith or unfair acts or practices that are relevant to the situation in this case. The trial court was able to review the opinions and put them in perspective, which would not have been possible for a lay jury. The opinion of the non-attorney expert on what the cases showed does not offer any help to the decision maker.

We have reviewed the opinions of the cases at issue. The existence of coverage was not an issue in any them. They did not involve interpretation of the language of the policy. Most of the cases were based on a bad faith refusal to settle, resulting in a judgment in excess of the policy limits. *Johnson v. Tennessee Farmers Mut. Ins. Co.* 205 S.W.3d 365 (Tenn. 2006); *Tennessee Farmers Mut. Ins. Co. v. Wood,* 277 F.2d 21, 24 (6th Cir. 1960); *Maclean v. Tennessee Farmers Mut. Ins. Co.*, 01A-01-9407-CH-00320, 1994 WL 697857 (Tenn. Ct.

---

[16]Among those was the following: "[a]dmit that Tennessee Farmers Mutual was found to have committed bad faith towards its insured in the following court cases," which statement was followed by a list of six cases. The insurance company's answer was, "[t]his Defendant neither admits nor denies the request, and states that the published opinions speak for themselves." The cases were then admitted into evidence, over the objections of TFM. It is unclear whether the jury read or considered those cases during their deliberations. TFM argues on appeal that the opinions should not have been admitted into evidence, and, maybe, that the jury should not have heard about the prior bad faith judgments. Because we have vacated the punitive damages holding on bad faith, and because we are reviewing only the trial court's decision on treble damages, we find it unnecessary to resolve this evidentiary issue.

App. Dec. 14, 1994). The cases are simply not probative of any pattern or consistent practice that occurred in this case.

Additionally, we find significant, although the expert did not, that only six instances of court holdings of bad faith occurred over twenty or thirty years (the oldest was from 1960). The occurrence of judgments of bad faith seems infrequent and very low considering the number of claims processed by TFM. We cannot conclude that any evidence supports a finding that TFM has a practice or pattern of conduct that would justify the trebling of damages in this case.

In the case before us, the Plaintiffs spend a number of pages in their brief citing cases from this and other jurisdictions interpreting "possession" and "lawful possession," with inconsistent definitions and outcomes. The Plaintiffs used that authority to argue strenuously that the words of the exception were ambiguous. Of course, Plaintiffs then argued that any ambiguity must be construed against the insurer. Nonetheless, it is difficult to understand how the insurance company's interpretation of an admittedly ambiguous term could amount to a knowing and willful violation of the TCPA's prohibition of deceptive and unfair acts.

We reverse the trial court's holding that treble damages, or enhanced penalties, were appropriate and vacate the award of treble damages.

## VIII. STANDING AND PROPER PARTIES

TFM argues that the trial court erred by dismissing its pre-trial motion for judgment on the pleadings under Tenn. R. Civ. P. 12.02. The motion was in large part a challenge to the rights of all the plaintiffs to sue. The insurance company contends on appeal, for example, that the trial court should have dismissed all the Leverettes' claims from the lawsuit because they were not insured by TFM and the insurance company owed absolutely no duty to them under the insurance contract.

In response to TFM's motion on the pleadings, Plaintiffs moved to amend their complaint to remove any claims by the Leverettes based on the insurance company's bad faith. They asserted, however, that the Leverettes were entitled to remain as plaintiffs, not because of their agreement with the Sanders, but because they were third party beneficiaries or subrogated judgment creditors of the Sanders' insurance policy. Under the amended complaint, the only relief the Leverettes sought from the trial court was a judgment for the insurance policy limits of $62,000.

The case of *Linehan v. Allstate Ins. Co.*, 1994 WL 164113 (Tenn. Ct. App. May 4, 1994) involves a claim similar to the one the Leverettes are asserting in the present case. In *Linehan*, a landlord obtained an $80,000 judgment against a tenant for damages caused by

a fire on  property owned by the landlord and occupied by the tenant.  The tenant had obtained a renter's insurance policy, but his insurance company declined to defend him.  The landlord then sued the tenant's insurance company, asserting that the judgment against the tenant made him a third party beneficiary on the insurance contract as well as the tenant's judgment creditor.

The landlord's claim was ultimately dismissed, but not because he lacked standing to sue.  Rather, the court held that the landlord's rights as a judgment creditor were derivative and thus could rise no higher than the rights the tenant possessed.  *Linehan v. Allstate Ins. Co.*, 1994 WL 164113 at *2.  Since the tenant lost his rights against the insurance company because of his uncooperative conduct, it followed that the landlord could derive no rights from him.[17]

In the present case, the trial court determined there was coverage, and we have affirmed.  We therefore conclude that, contrary to TFM's arguments, the Leverettes were entitled to remain as plaintiffs in this case, at least to the extent of their subrogation rights to the proceeds of the Sanders' insurance policy limits.[18]

TFM also argues that Claire Sanders should have been dismissed from the suit because "there was no evidence that she suffered any damage."  The insurance company contends that the agreement between the Leverettes and Sanders eliminated the possibility that "Claire Sanders will ever have to pay one penny to the Leverettes," and thus that she cannot show any injury for which the insurance company may be held liable.  However, the Bedford County court rendered an enforceable judgment against Claire Sanders, and in the eyes of the law that constitutes an injury, whether or not that judgment is ultimately satisfied.

As to Plaintiffs Chad and Donna Sanders, TFM acknowledges that they were entitled to proceed on their breach of contract claim, but it argues that their claims for bad faith and for violation of the TCPA should have been dismissed because the Bedford County court did not enter a judgment against them.  TFM thus contends that the Sanders should have been permitted to proceed at trial only upon their claim for medical payment coverage of $5,000.

---

[17]TFM notes that Tennessee is not a direct action state, which means that in Tennessee an injured plaintiff cannot directly sue the liability insurance carrier of the defendant who allegedly caused her injury. *Seymour v. Sierra*, 98 S.W.3d 164, 165 (Tenn. Ct. App. 2002).  But Tennessee, like many states, has allowed injured parties to file suit against insurance companies that have refused to honor the terms of their policies after judgment has been rendered against an insured tortfeasor. *See Ferguson v. Nationwide Property & Cas. Ins. Co.*, 218 S.W.3d 42 (Tenn. Ct. App. 2006); *Franklin v. St. Paul Fire & Marine Ins. Co.*, 534 S.W.2d 661 (Tenn. Ct. App. 1975) (injured party deemed to be third party beneficiary of insurance policy).

[18]If the Sanders are proper plaintiffs, we fail to see how the inclusion of the Leverettes as parties affects the judgment or prejudices TFM.

Even if the Sanders were not entitled to proceed against TFM for bad faith in their individual capacities, there can be no doubt that they had the right to proceed as parents and guardians of their daughter. Thus, the trial court did not err in declining to grant TFM's motion for judgment on the pleadings.

## IX. THE TRIAL COURT'S REALLOCATION OF DAMAGES

TFM's counsel argued vigorously during his closing argument that the jury should not award any damages at all to Claire Sanders because it was the minor's own foolish and reckless behavior that caused so much damage, and that "if you give money to Claire Sanders, what you may end up doing is rewarding her for causing all of this to begin with." His argument was apparently persuasive, for when the jury returned its verdict, it pointedly awarded "zero" to Chad and Donna Sanders as parents and guardians of Julia Claire Sanders. However, the jury did award Chad and Donna Sanders $1.2 million in their individual capacities as compensatory damages for TFM's bad faith.[19]

Plaintiffs subsequently filed a "Motion for Entry of Judgment on Special Jury Verdict." They asked the court to exercise its authority under Tenn. R. Civ. P. 49 to enter a judgment reallocating the damages awarded by the jury to better reflect the legal basis for those damages. Plaintiffs suggested that the court, acting as 13th juror, find that the jury awarded the verdict amounts to the wrong parties and that the weight of the evidence supported reallocation of the awards. The trial court's judgment, filed on September 14, 2010, was consistent with that motion.

The court awarded $1 million, the amount of the Bedford County Judgment against Claire Sanders, to Chad and Donna Sanders in their representative capacity as parents and guardians of Julia Claire Sanders, and $200,000 to Chad and Donna Sanders individually. The $200,000 award is no longer at issue due to our vacating the judgment that TFM acted in bad faith, leaving only the award under the TCPA in place.

---

[19]After judgment was entered, TFM renewed its motion for directed verdict or for a new trial, accompanied by the affidavit of juror John Russell, which was apparently offered for the purpose of demonstrating the jury's intention in regard to the allocation of damages. Mr. Russell stated, "[a]fter hearing the proof, it was our specific and unanimous intent to award Julia Claire Sanders, the thirteen (13) year old tortfeasor whose negligence began this whole ordeal, no recovery whatsoever. All jurors agreed that she was not entitled to any recovery. We specifically crafted our verdict to ensure that Julia Claire Sanders would not recover any amount in damages." Plaintiffs argue that this affidavit was inadmissible under Rule 606(b) of the Tennessee Rules of Evidence, and should not be considered by this court.

The court declared that reasonable minds could not differ as to the amounts of compensatory damages incurred by Chad and Donna Sanders as parents and guardians of Claire Sanders, including economic damages in "the respective amounts of $1 million and $1,845.75.[20] The court stated, however, that the jury had "misapprehended the effect of awarding the damages to M/M Sanders, individually, as opposed to M/M Sanders in their representative capacity." The court accordingly declared that it had decided to "exercise its authority under Rule 49 and/or Rule 59, to correct this obvious error by reallocating the damages."

TFM argues that by acting as it did, "the trial court failed to enter a Judgment reflecting the true jury verdict," and that "the trial court had no authority to alter the jury verdict." The insurance company cites several cases for the well-known principle that it is the trial court's duty to enter a judgment that is consistent with the jury verdict.

For example, in *State v. Morris,* 788 S.W.2d 820, 825 (Tenn. Crim. App. 1990), the Court of Criminal Appeals stated that "the trial judge had no right to substitute for the rendered verdict a judgment that is substantially different." In *Ladd by Ladd v. Honda Motor Co.*, 939 S.W.2d 83 (Tenn. Ct. App. 1996), this court stated that "[t]he verdict, whether general or special, is binding on the trial court and the parties unless it is set aside through some recognized legal procedure. Accordingly, neither the trial court nor the parties are free to disregard a jury's verdict once it has been property returned." *Id*. at 94 (citing *Smith County Education Ass'n v. Anderson,* 676 S.W.2d 328, 336 (Tenn. 1984)).

As even those quotes imply, however, the general principle is subject to some narrow exceptions. One such exception is found at Tenn. R. Civ. P. 49.02, which gives the trial court some leeway when there are inconsistencies between a general verdict and a special verdict.

> When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.

---

[20]In addition to the $1 million verdict, the court's order included $1,845.75, representing costs and attorney fees incurred by the Sanders because of TFM's refusal to defend them against the claim filed in Bedford County.

In its judgment in the present case, the trial court stated that "the jury's special verdicts on the issues of liability on all theories are consistent with each other but are inconsistent with the general damage awards to the respective parties."[21]  The court also found that "reasonable minds cannot differ about the damages incurred by Chad and Donna Sanders, parents and guardians for Julia Claire Sanders," and that those damages were the Bedford County judgments in the respective amounts of $1,000,000 and $1,845.75.  The court concluded that it was obvious that the jury intended to award the amount of the Bedford County judgments, but simply awarded them to the wrong party, and it directed an entry of judgment consistent with that conclusion.

Our Supreme Court has also suggested that the trial court is not relegated to an entirely ministerial role after a jury renders its verdict, for it interprets the law that the verdict must comply with. "It is for the jury to determine the facts and the trial judge to apply the appropriate principles of law to those facts." *Anderson,* 676 S.W.2d at 338.  Accordingly, our appellate courts have approved judgments which deviated from the jury verdict in some respects when the application of the appropriate principle of law indicated that such deviation was necessary.

For example, in *Spence v. Allstate Insurance Co.*, 883 S.W.2d 586 (Tenn. 1994), the jury returned a verdict of $4,990 against the party who allegedly set a house fire, causing a substantial insurance loss.  The insurance company filed a motion to increase the judgment to $88,777, the amount the insurance company had been required to pay because of the fire.  The trial court granted the motion, and this court affirmed.

Our Supreme Court also affirmed, ruling that the insurance company was entitled to be indemnified for its entire loss (the full amount of which was undisputed) and that the proper role of the jury as the trier of fact was simply to determine who was responsible for setting the fire.  "It is moreover well settled that a trial court may modify a judgment when the damages awarded by the jury conflict with the undisputed facts concerning damages." *Spence*, 883 S.W.2d at 595; *see also Collins v. Summers*, 88 S.W.3d 192 (Tenn. Ct. App. 2002) (affirming the trial court's upward adjustment of damages over the jury's general verdict amounts).

The trial court's judgment in the present case affirmed the jury's finding of liability for TCPA against TFM and the amount of its verdict for compensatory damages.  It also agreed that the judgment was to be paid to TFM's insured.  The court ruled, however, that

---

[21]The entire verdict in this case was returned in response to a single set of specific interrogatories, so it is unclear if and how a line may be drawn between a general and a specific verdict.  We believe that under the circumstances of this case, the trial court acted within its authority in reallocating the damages as it did.

as a matter of law, the portion of the recovery that represented the $1 million Bedford County judgment against Claire Sanders should be awarded to the Sanders in their representative capacity rather than in their individual capacity.

By modifying the verdict so the award would run in favor of Chad and Donna Sanders in their representative capacities as parents and guardians of Claire Sanders, the trial court was able to align the Sanders' legal obligations with the purposes of the jury award. Thus, the trial court acted properly, and its judgment did not violate the jury's role as the trier of fact.

## X. ATTORNEY FEES

TFM also challenges the trial court's awards to Plaintiffs of attorney fees and pre-judgment interest. Both awards were included in the same judgment, but they merit separate discussion. The legal basis for an award of attorney fees in a claim under the TCPA is found in Tenn. Code Ann. § 47-18-109 (e)(1), which states that, "[u]pon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs."

Plaintiffs' motion for attorney fees was accompanied by a memorandum of law and by the affidavit of their attorney, Richard Matthews. The attorney testified that he had accepted employment with the Plaintiffs on a contingent fee basis for 40% of the gross amount of their recovery (if any) in addition to his costs. He further testified that he had not received any fees or costs from the Plaintiffs as of the date of his affidavit. He estimated that the actual time he expended on the case amounted to 351 hours over the course of 19 months and that he had advanced approximately $20,000 for expenses.

Mr. Matthews' affidavit also declared that reasonable hourly rates for his services in this case, in consideration of the factors set out in Rule 8, RPC 1.5 of the Rules of the Tennessee Supreme Court, would be $300 per hour.[22] He subsequently filed the affidavit of

_____

[22]Rule 8, RPC 1.5 reads:
A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

(continued...)

another experienced Columbia attorney, Russell Parkes, who testified that because of the amount of time the case would clearly require, the insurance coverage issues to be litigated, and the uncertainty of a favorable resolution of those issues, he would have been reluctant to accept representation of Plaintiffs on a one-third contingency fee basis. Mr. Parkes testified that in his professional opinion, a 40% contingent fee in the matter was "fair, reasonable and comports with the guidelines and factors set forth in Tennessee Supreme Court Rule 8 RPC 1.5." TFM did not file any countervailing affidavits.

The trial court awarded attorney fees to the Sanders in the amount of $1,202,214, which amounts to 40% of their $3,005,535 treble damages award under the TCPA.[23] TFM challenges the fee award on several grounds.[24] TFM argues that the attorney fee awarded by the trial court was not "reasonable," as is required by Tenn. Code Ann. § 47-18-109 (e)(1) and by Supreme Court Rule 8, RPC 1.5(a), but rather that it was excessive. The insurance company notes that 351 hours at $300 an hour would only yield attorney fees in the amount of $105,300, and that the trial court's award was over ten times the hourly rate. A trial court's determination of attorney's fees is within the court's discretion, and will be upheld unless the trial court abuses that discretion. *Kline v. Eyrich*, 69 S.W.3d 197, 203 (Tenn. 2002); *Shamblin v. Sylvester*, 304 S.W.3d 320, 331 (Tenn. Ct. App. 2009).

It can hardly be disputed that the fee awarded in this case is unusually large. Contingency fee arrangements can sometimes justify larger fees, however, because they "shift to the attorney some or all of the risk that the client's claim will result in no recovery." *Alexander v. Inman*, 903 S.W.2d 686, 696 (Tenn. Ct. App. 1995). Our Supreme Court has accordingly stated that "[a]n attorney's fee should be greater where it is contingent than where it is fixed." *United Medical Corp v. Hohenwald Bank*, 703 S.W.2d 133, 136 (Tenn. 1986). Ultimately, however, "the reasonableness of the fee must depend upon the particular circumstances of the individual case." *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 182

---

[22](...continued)
   (8) Whether the fee is fixed or contingent;
   (9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
   (10) whether the fee agreement is in writing.

[23]The court also awarded the Sanders discretionary costs in the amount of $11,040.25.

[24]TFM argues, once again, that Plaintiffs did not suffer any legally cognizable injury, that the trial court erred by granting Plaintiffs summary judgment on the question of coverage, that it was not guilty of bad faith in any case, and that the trial court did not have the authority to modify the jury verdict. We have already dealt with those issues in detail. TFM repeats the same arguments, essentially that since the coverage decision was wrong, everything else must be reversed, on almost every issue it raises.

(Tenn. 2011) (citing *White v. McBride,* 937 S.W.2d 796, 800 (Tenn. 1996)). Under the circumstances of this case, the size of the attorney fee awarded is excessive.

When attorney fees are assessed against a defendant in a case under the TCPA, the defendant is required to pay those fees in addition to any judgment for violating the Act. *See Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 408 (Tenn. 2002); *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 10 (Tenn. Ct. App. 1992); *Campbell v. Teague,* 2010 WL 1240732 (Tenn. Ct. App. Mar. 31, 2010) (no Tenn. R. App. P. 11 application filed). A contingency fee arrangement, on the other hand, generally provides that a successful attorney will be paid from the proceeds of the judgment (if any) that the attorney obtains for his client. We are unaware of any TCPA cases where the trial court assessed attorney fees against a defendant based solely upon a contingency agreement, although we do not rule out the possibility that such an award may be upheld in appropriate circumstances.[25]

There is thus an inherent tension between the attorney fee provisions of the TCPA and the normal incidents of a contingency fee arrangement. We note that unlike an award of treble damages under the Tennessee Consumer Protection Act, an award of attorney fees is not meant to be punitive in nature. *Miller v. United Automax*, 166 S.W.3d 692, 697 (Tenn. 2005). Rather, "the potential award of attorney's fees under the Tennessee Consumer Protection Act is intended to make prosecution of such claims economically viable to plaintiff." *Id.* (citing *Killingsworth*, 104 S.W.3d at 535).

The statutory basis for an award of fees requires that the fees be reasonable. Tenn. Code Ann. § 47-18-109(e)(1). The purpose of such an award is to make TCPA lawsuits economically viable, not to punish the defendant. Other punitive sanctions are available where warranted.

In the present case, however, we find it difficult to justify an award that requires the defendant to pay Plaintiffs' attorney more than ten times the attorney's normal hourly rate, when the agreement between the attorney and his clients was that the attorney's fee would be taken out of Plaintiffs' recovery. By awarding over $1 million[26] to be paid by the defendant, the trial court imposed punishment on a defendant. We do not believe such a judgment serves the purposes for which the TCPA allows attorney fees to be awarded. We

---

[25]However, in *Adkinson v. Harpeth Ford-Mercury, Inc.*, 1991 WL 17177 (Tenn. Ct. App. Feb. 15, 1991), this court affirmed an attorney fee award of $20,004, which was more than the plaintiff's attorney would have received under his contingency fee contract.

[26]Of course, since we have vacated the treble damage award and the punitive damage award, applying the percentage would result in a smaller amount to be awarded to the attorney even if we approved the methodology used by the trial court.

find that an award based upon the attorney's customary rate, which has been proved reasonable, would serve the purpose of making TCPA suits economically feasible.

We accordingly reduce the attorney fee award to the amount Mr. Matthews testified to in his affidavit: $105,300, plus his advanced costs of $20,000, for a total award of $125,300. Of course, this award in no way impairs the attorney's right to seek the remainder of his contingency fee from Plaintiffs under the terms of their contract.

## XI. PREJUDGMENT INTEREST

The trial court awarded Plaintiffs prejudgment interest at the rate of 10% per year "on the compensatory award of the Bedford County judgments in the amount of $1,000,000 and $ 1,845.75," running from the date of entry of those judgments in Bedford County.

Tennessee Code Annotated § 47-14-123 gives courts and juries the authority to award prejudgment interest "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." TFM insists that the award of pre-judgment interest "was another blatant error by the trial court and should be reversed." The insurance company relies on the following language from *Myint v. Allstate Insurance Co.*, 970 S.W.2d at 927, to support its argument: "[t]he purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds **to which he or she was legally entitled**, not to penalize a defendant for wrongdoing." (emphasis supplied by TFM).[27]

Among the factors the court must consider in determining whether prejudgment interest is appropriate are whether the amount of the judgment upon which the interest award is based was certain or ascertainable and whether the existence of the obligation was disputed on reasonable grounds. *Hunter v. Ura,* 163 S.W.3d 686, 706 (Tenn. 2005). The amount that TFM would be liable for if it were found to have acted in bad faith or in violation of the TCPA was ascertainable and certain because it was the $1 million Bedford County judgment for which its insureds were liable. Similarly, the amount of damages from the breach of contract claim was also ascertainable because of the policy limits.

However, TFM argues that it had reasonable grounds to dispute coverage. Although we have affirmed the holding that the policy provided coverage, that holding in and of itself does not mean that it was certain that TFM would be found in breach of the contract or, more significantly, in violation of the TCPA.

---

[27]TFM then reiterates all its earlier arguments that the judgments against it were invalid, and thus that the plaintiffs were not legally entitled to any funds upon which a prejudgment interest award could be assessed.

The uncertainty of either the existence or amount of an obligation does not necessarily mandate a denial of prejudgment interest. *See Scholz v. S.B. International, Inc.* 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000) (citing *Myint*, 970 S.W.2d at 928). Rather, the trial court must decide if the award of prejudgment interest is fair, given all the circumstances of the case. *Scholz,* at 83; *Hartford Underwriters Ins. Co. v. Penney*, 2010 WL 2432058, at *10 (Tenn. Ct. App. June 17, 2010) (citing *In re Estate of Ladd,* 247 S.W.3d 628, 645 (Tenn. Ct. App. 2007)).

Among the factors supporting an award of prejudgment interest in this case are that Plaintiffs gave TFM fair warning that they could become subject to a substantial judgment in Bedford County, for which it intended to hold TFM liable; that it did not unreasonably delay in filing suit to recover the amount of that judgment against the insurance company once it was entered; and that TFM had full use of the money during this litigation. Ordinarily, the fact that Plaintiffs have not been compensated in any way for the loss of use of those funds during the interval between the Bedford County judgment and the Maury County judgment would be an important factor in determining fairness. *See Scholz*, 40 S.W.3d at 86; *In re Estate of Ladd,* 247 S.W.3d at 647. However, in this case Plaintiffs did not pay the Bedford County judgment against their daughter, so they never suffered the loss of use of the funds. The judgment was in favor of the Leverettes, but they were not the policyholders, and their subrogation interests cannot be greater than the Sanders' interests.

An award of prejudgment interest lies within the sound discretion of the trial court. *Spencer v. A–1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Howard G. Lewis Construction Co . v Lee,* 830 S.W.2d 60, 66 (Tenn. Ct. App. 1991); *B.F. Myers & Sons v. Evans*, 612 S.W.2d 912 (Tenn. Ct. App. 1980). Such a decision will not be disturbed unless the record reveals a manifest and palpable abuse of that discretion. *Myint*, 970 S.W.2d at 927; *In re Estate of Ladd,* 247 S.W.3d at 644.

While we may have made a different decision in the first instance, after closely reviewing the extensive record in this case, we cannot conclude that the trial court abused its discretion in awarding prejudgment interest to Plaintiffs for the interval between the Bedford County judgment and the trial court's judgment herein. That award is affirmed.

## XII. REMAINING ISSUES

Among the remaining issues raised by TFM are several that involve pre-trial decisions and are within the discretion of the trial judge.[28]

_____

[28]Some other issues are pretermitted by our holdings in this opinion.

## A. Admissibility of Wendy Leverette's Testimony

TFM filed a motion *in limine* to exclude any testimony by Wendy or Jason Leverette about the accident or about the injuries suffered by Wendy Leverette. The trial court denied the motion. The insurance company contends on appeal that this was error, because it was in no way responsible for the accident or for Ms. Leverette's injuries, and because the questions before the trier of fact involved only the actions of the insurance company. TFM thus asserts that Ms. Leverette's pain and her medical bills are totally irrelevant to the question of whether it properly evaluated the coverage issue, and that the jury should not have been allowed to even consider those facts, because under Tennessee Rule of Evidence 402, "[e]vidence which is not relevant is not admissible."

The trial court explained its reason for denying TFM's motion to exclude testimony about Wendy Leverette's injuries in its order dismissing that motion:

> The court finds that such evidence is relevant to the issue of whether the defendant is or is not guilty of bad faith. It is clear to the court that one of the factors the jury may use in determining bad faith is whether the Defendant exercised ordinary care in investigating the claim and the extent of damages for which its insured could be held liable. This makes the injuries of Wendy Leverette relevant.

TFM's answer to Plaintiffs' complaint included a statement that the $1 million Bedford County judgment was "void and of no effect," and that it "was obtained either in collusion between the parties or improperly." TFM thus called into question the factual predicate for the Bedford County judgment, thereby making it necessary for the Plaintiffs to produce evidence about the injuries upon which the judgment was based.

It is well-established that "[d]ecisions regarding the admissibility of testimony and other evidence rest in the trial court's sound discretion," *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 199 (Tenn. Ct. App. 2008). Such decisions are accordingly reviewed under the abuse of discretion standard. *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic and reasoning that causes an injustice to the party complaining. *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn. 2001); *Massachusetts Mutual Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002). In light of TFM's announcement of its challenge to the validity of the Bedford County judgment as well as the principles set out in prior decisions by our courts, we do not believe the trial court abused its discretion by allowing Ms. Leverette to testify or by admitting a photograph of her injury into evidence.

**B. Jury Selection**

TFM also appeals the trial court's grant of Plaintiffs' motion to exclude the insurance company's policyholders from the jury pool. The record shows that Plaintiffs initially filed a very broad motion to exclude from the pool of jurors virtually any person with a possible connection to TFM. Plaintiffs noted that Tenn. Code Ann. § 22-1-104 prohibits any party from acting in a case in which that person is interested and that TFM is a mutual insurance company which gives all policyholders a right to vote and a theoretical share in the company. Plaintiffs reasoned that TFM's policyholders were interested because "they had a stake in the company and could be adversely affected by the verdict." TFM filed a response in opposition to Plaintiffs' motion, and Plaintiffs subsequently amended their motion to seek the exclusion of only those potential jurors who were currently employed by or insured by TFM. The trial court granted the motion.

TFM asked the trial court to reconsider its decision, providing the affidavit of Ed Lancaster, the Secretary and General Counsel for Tennessee Farmers Mutual Insurance Companies. Mr. Lancaster swore that TFM's policyholders would not be affected by the outcome of the case, and that because TFM held ample surplus funds, there was no danger that their premiums would increase or decrease, regardless of the verdict. The trial court denied TFM's motion to reconsider.

It is a basic principle of the jury system that a litigant is entitled to a jury composed of persons free from bias or prejudice. *Wolf v. Sundquist,* 955 S.W.2d 626, 629 (Tenn. Ct. App. 1997). TFM argues on appeal, however, that rather than exclude a broad swath of the population from serving on the jury, the trial court should have allowed the parties to use the process of *voir dire* to determine on an individual basis whether any potential juror would be biased because of its status as a TFM policyholder. The insurance company has directed our attention to several cases that stand for the proposition that membership in a particular group does not automatically raise an implication of bias in a potential juror.

First, TFM cites *Nelson v. State*, 292 S.W.2d 727 (Tenn. 1956), which involved criminal vandalism related to a strike by telephone company employees. Our Supreme Court ruled in that case that the trial court erred in excluding all union members from the jury venire, because the "court's ruling is too broad." *Nelson v. State,* 292 S.W.2d at 731. Presumably, the exclusion of only those who were members of the telephone workers union would have passed muster.

Other Tennessee cases cited by TFM involve challenges to verdicts in criminal cases based on belated discovery of the affiliations of individual jurors. *State v. Pender*, 687 S.W.2d 714 (Tenn. Crim. App. 1984) (juror in rape trial was part-time police officer); *State v. Mason,* 623 S.W.2d 126 (Tenn. Crim. App. 1981) ( juror in rape trial had formerly

belonged to K.K.K.). At most, these cases only suggest that if it had decided to do so, the trial court could have denied the motion to exclude TFM's policyholders and allowed some of them to become members of the jury without thereby creating a biased panel.

Of course, the systematic exclusion from juries of any readily identifiable racial, religious, political group, or suspect class, is prohibited on constitutional grounds. *J.E.B. v. Alabama*, 511 U.S. 127 (1994) (jurors may not be stricken solely on the basis of gender); *Batson v. Kentucky*, 476 U.S. 79 (1986) (use of peremptory challenges to strike jurors on racial grounds forbidden); *Hernandez v. Texas*, 347 U.S. 475 (1954) (persons of Mexican descent could not be excluded from jury service); *Woodson v. Porter Brown Limestone Co., Inc.*, 916 S.W.2d 896, 902 (Tenn. 1996) ("Racially-based juror exclusions affect and injure the integrity of the justice system.") Nothing like that has been alleged in the present case.

Another jury selection principle is that "[p]arties are constitutionally entitled to a venire which represents a fair cross-section of the community." *Woods v. Herman Walldorf & Co., Inc.*, 26 S.W.3d 868, 875 (Tenn. Ct. App. 1999). TFM has presented no proof, however, that its policyholders are distinct from the general community in any way other than their choice of insurer. *See State v. Hester*, 324 S.W.3d 1, 40 (Tenn. 2010) ("Not all purposeful exclusion of individuals sharing a common trait is inherently unconstitutional or improper."). Thus, while a blanket exclusion of all TFM policyholders from the jury might not be the best or the only way to avoid empaneling jurors who could be biased in favor of the company, TFM has offered no theory as to why a jury from which its policyholders are absent would be biased against them.

There are also no indications in the record to suggest that the jury that was ultimately empaneled to hear the case against TFM was not composed of fair and impartial jurors. TFM therefore cannot claim that it was denied a fair trial before an unbiased jury. Further, absent statutory or constitutional violations, decisions about jury selection remain within the sound discretion of the trial judge. *State v. Hugueley*, 185 S.W.3d 356, 378 (Tenn. 2006); *State v. Elrod*, 721 S.W.2d 820, 822 (Tenn. Crim. App. 1986).

The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). Further, under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *Eldridge*, 42 S.W.3d at 85 (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)). The trial court acted within its discretion in limiting the jury pool.

## C. Amendment of Scheduling Order

Another issue raised by TFM was the trial court's refusal to amend its scheduling order to allow the insurance company to present the testimony of Russell Reviere, the insurance company's expert witness, to the jury. The scheduling order filed on February 12, 2010, set trial dates of September 1, 2 and 3, 2010, as well as dates for important preliminary steps to be accomplished before trial. The dates that are relevant to this issue were as follows: Plaintiffs were required to disclose their expert witnesses by April 30, 2010. Defendants were required to disclose their expert witnesses by June 4, 2010. Discovery depositions of all expert witnesses were required to be completed by July 2, 2010.

In response to interrogatories, Plaintiffs disclosed the identity of their two expert witnesses, John Moyer and Ronald Freemon, on March 22, 2010, more than thirty days before their deadline. Their disclosure included extensive details as to the experts' qualifications, the matters about which they were expected to testify, and the gist of their opinions on those matters. TFM identified its expert, Scott Walls, on June 4, 2010, the very last possible day for it to do so under the scheduling order. TFM took the deposition of John Moyer on June 15, 2010. After reviewing the testimony of Mr. Moyer, TFM asked its attorney to seek an expert to address his testimony, and he contacted attorney Russell Reviere, who agreed to assume that role.

On August 17, 2010, two weeks before trial, TFM filed a motion to amend the scheduling order to allow it to "present and produce at trial an expert witness previously undisclosed." Attached to the motion was a statement prepared by Mr. Reviere, together with his Curriculum Vitae. The trial court denied the motion in an order dated August 20, 2010. The court stated that TFM had failed to show any excusable neglect for its failure to comply with the scheduling order, and it found that the shortness of the time before trial would place an "unnecessary and undue burden" upon Plaintiffs to prepare for Mr. Reviere's testimony.

The standards for the exercise of the trial court's authority in such matters is set out in Tenn. R. Civ. P. 6.02, which reads in relevant part,

> Enlargement—When by statute or by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may, at any time in its discretion, . . . (2) upon motion made after the expiration of the specified period permit the act to be done, where the failure to act was a result of excusable neglect

As the above rule indicates, a trial court's decision on a motion to amend a scheduling order is within its discretion. Such a decision is therefore reviewed under the abuse of discretion standard. *See Williams v. Baptist Memorial Hospital*, 193 S.W.3d 545, 551 (Tenn. 2006). Our Supreme Court has also stated that where an enlargement of time is requested after the original time has elapsed, Rule 6.02(2) requires the party requesting the enlargement to show that its failure was due to excusable neglect and that the opposing party has not been prejudiced by the delay. *See Douglas v. Estate of Robertson*, 876 S.W.2d 95, 97 (Tenn. 1994).

TFM argues that the trial court abused its discretion by not allowing it to present the testimony of Mr. Reviere, that the late filing of its motion to amend the scheduling order was due to excusable neglect, and that Plaintiffs would not have been prejudiced if the trial court had granted its motion. TFM discusses the sequence of events that led to its delay in presenting Mr. Reviere as an expert witness, but it is not clear why its neglect should be considered excusable.

TFM complains that the deadline for disclosing its expert witnesses had already passed when it took the deposition of John Moyer, but it does not explain what prevented it from taking his deposition earlier. It also does not explain why it decided that the testimony of Scott Walls, the individual previously identified as the insurance company's expert, would not be adequate. TFM states, however, that it identified Mr. Walls as its expert out of an abundance of caution, and it argues that he cannot be considered an independent expert under Tenn. R. Civ. P. 26.02(4)(A) because he is an employee of the defendant insurance company.

TFM cites several cases that make a distinction between an independent expert under Tenn. R. Civ. P. 26.02(4)(A) and a witness whose expertise arises from employment by a party. *See White v. Vanderbilt University*, 21 S.W.3d 215, 224 (Tenn. Ct. App. 1999) and *Heath v. Memphis Radiological Professional*, 79 S.W.3d 550, 559 (Tenn. Ct. App. 2001). The insurance company does not explain, however, how that distinction relates to the question of excusable neglect in the present case, nor how it has been disadvantaged by its own decision to name Mr. Walls as an expert witness. Clearly, TFM could have chosen to retain an independent expert prior to the deadline if it had wished to do so.

At the conclusion of Mr. Reviere's testimony, TFM renewed its motion that he be allowed to testify before the jury.[29] That motion was denied.

---

[29]TFM called Russell Reviere to testify out of the presence of the jury for an offer of proof. Mr. Reviere testified that his thirty year law practice had focused almost 100 percent on the area of insurance defense. He stated that he had familiarized himself with all the evidence in this case, and that in his opinion, Beth Neeley was never in lawful possession of her mother's car, because she did not have a license and, thus,

(continued...)

We have examined the deposition of Scott Walls and the statement of Russell Reviere that was attached to TFM's motion to amend the schedule. Both individuals stated that in their opinion the decision to exclude Claire Sanders from coverage was correct, and that the insurance company carried out its investigation of the accident and reached its decision in good faith. Russell Reviere offered a specific explanation as to why he did not believe the insurance company had acted in bad faith, while Scott Walls only indirectly addressed that question. We note, however, that TFM was well aware that Plaintiffs' claim of bad faith against the insurance company was an integral part of their Complaint. So the insurance company can hardly complain that John Moyer's testimony on that issue amounted to some kind of unfair ambush.

We hold that the trial court acted well within its discretion in denying TFM's motion to amend the scheduling order.

## XIII. CONCLUSION

We affirm the judgment finding TFM liable for breach of contract and the award of damages for that breach, which was $50,000 and $12,000 (policy limits for personal injury and property damage) to the Sanders, parent and guardians of Claire, and Leverettes; and $5,000 (medical payments) to the Sanders, in their individual capacity.

We reverse the judgment based on the tort of bad faith. Accordingly, we vacate the compensatory damages, $1.2 million, and punitive damages, $500,000, based on the bad faith claim.

We affirm the verdict and judgment holding that TFM had committed unfair or deceptive act or practice under TCPA causing damages to Sanders. The trial court's award of $1,000,000 in compensatory damages is affirmed. The trial court held that the breach of contract damages were subsumed within the $1,000,000 judgment, and we agree. The trial court correctly denied $200,000 in damages that had been awarded to the Sanders by the jury

---

[29](...continued)
could not lawfully operate it on the roads in the state of Tennessee. He concluded, therefore, that she could not have given Claire Sanders valid permission to drive it. Asked if he thought the phrase "lawful possession" was open to different interpretations, he stated that in his opinion it was not: "To me, 'lawful' is a lot like pregnant, it is either one or the other. It's either lawful or unlawful." Mr. Reviere also testified that in his opinion Frank Smith had conducted his investigation in good faith. He was asked if Mr. Smith should have taken a statement from Beth Neeley as part of that investigation. He stated that "in a perfect world I would never argue with taking statements from anyone at anytime," but that since in his opinion Beth Neeley was not in lawful possession of the automobile, her statement would not have added anything of value to the investigation.

because they represented emotional distress damages, which are not "actual damages" as allowed by the TCPA.

We reversed the trial court's award of trebled damages under the TCPA, and must vacate that award. In calculating the trebled damages, the trial court stated that the damages to be trebled were $6100, for economic losses to the Sanders individually, and $1,001,845 for the Sanders in their capacity as parents and representatives of Claire.

We affirmed the award of prejudgment interest from the date of the Bedford County judgment through the judgment of the trial court in the case under appeal, at the rate of 10% per year. We modified the award of attorney fees and costs advanced by the attorney to $125,300.[30]

Costs are taxed to the Defendant, Tennessee Farmers Mutual Insurance Company for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[30]It is not clear whether a discretionary cost award was made and/or is challenged in this appeal.